**EASTERN SHORE NATURAL GAS COMPANY, a Delaware corporation, Appellant,**

v.

**The DELAWARE PUBLIC SERVICE COMMISSION, Appellee.**

Superior Court of Delaware, Kent County.

Submitted: Nov. 13, 1992.

Decided: Feb. 19, 1993.

William A. Denman, of Schmittinger & Rodriguez, P.A., Dover, for appellant.

Regina A. Iorii and James McC. Geddes, of Ashby & Geddes, Wilmington, for appellee.

A. Hays Butler and Peter F. Clark, of Delmarva Power & Light Co., and Gregory A. Inskip, of Potter, Anderson & Corroon, Wilmington, for Delmarva Power & Light Co., amicus curiae.

## OPINION

RIDGELY, President Judge.

Eastern Shore Natural Gas Company ("Eastern") appeals a decision from the Public Service Commission ("Commission") in which the Commission held that Eastern is a public utility pursuant to 26 *Del.C.* § 102(2) subject to regulatory supervision by the Commission. Eastern further appeals the Commission's determination that regulation of Eastern with regard to the rates for direct end use sales within the State of Delaware is not federally preempted by the Federal Energy Regulatory Commission ("FERC") and the Natural Gas Act, 15 U.S.C. Ch. 15B.

Eastern asserts that the Commission erred as a matter of law in its interpretation of the phrase "for public use" contained in the definition of "public utility" in 26 *Del.C.* § 102(2). Eastern further argues that substantial evidence does not exist to support the Commission's finding that Eastern is a public utility. Finally, Eastern maintains that the Commission erroneously determined it was not federally preempted from regulating Eastern with regard to its direct end users. The Court finds no merit to these claims and concludes that the decision below should be affirmed.

### *Procedural History*

On September 29, 1964, Chesapeake Utilities Corp., the parent company of Eastern, and Delaware Power & Light Company ("Delaware Power") entered into a Stipulation of Settlement designed to resolve various territorial disputes within the Delaware area. The 1964 Stipulation addressed Eastern's natural gas obligations to two companies located within Delaware Power's territory, one of which was Stauffer Chemical Company ("Stauffer"). The Stipulation authorized Eastern to continue its service obligations to Stauffer as long as Eastern was able to fulfill Stauffer's natural gas requirements.[1]

On August 30, 1990, Formosa Plastics Corp., the successor in interest of Stauffer Chemical Co. ("Formosa"), filed a complaint with the Commission against Eastern, Chesapeake, and Delmarva Power & Light Co., the successor in interest of Delaware Power & Light Company ("Delmarva"), based on its inability to transport natural gas it had purchased in Texas to its manufacturing plant in Delaware. The complaint primarily asserted that Eastern's service obligations to Formosa were inadequate to meet Formosa's natural gas requirements because of Eastern's refusal to provide transportation services.[2] The Commission opened Complaint Docket No. 299–90 to consider Formosa's complaint. Delmarva, Chesapeake, and Eastern were directed to answer the complaint, and a hearing examiner was assigned to conduct evidentiary hearings. Chesapeake and Eastern answered the complaint alleging, *inter alia,* that the Commission did not have jurisdiction over the agreement between Formosa and Eastern. In addition, Chesapeake and Eastern raised the affirmative defense that any complaints by Formosa regarding quality of service should be directed to FERC.

On June 3, 1991, Formosa, Delmarva, Chesapeake, and Eastern filed a settlement agreement with the Commission and informed the Commission that the complaint had been resolved to the satisfaction of the parties.

On June 21, 1991, Commission staff issued a recommendation that the Complaint docket

---

1. The Stipulation stated in relevant part:
 Eastern Shore Natural Gas Company may continue to serve the two customers it now serves north of said dividing line, to wit: Tide Water Oil Company and Stauffer Chemical Co., so long as it can continue to fulfill the natural gas requirements of said two customers, and any other enterprise in which either of them have a financial interest which may be now or hereafter located on or contiguous to the present sites now owned by said two customers in New Castle County, but it will not add or serve any additional customers north of said dividing line unless required to do so by any Federal Regulatory Agency having jurisdiction.
 Stipulation of Settlement, p. 4, approved by the Commission on November 18, 1964, Public Service Commission Docket No. 431.

2. Prior to filing the complaint, Formosa investigated the possibility of supplanting Eastern Shore's gas service with that of Delmarva due to Eastern's refusal to provide transportation services. However, Delmarva was reluctant to provide services to Formosa due to the restrictions imposed by the 1964 Stipulation.

remain open and the relationship between Eastern and its direct-sale customers be investigated to determine whether the Commission could assert jurisdiction over Eastern as a public utility. Subsequent to the investigation and oral arguments by counsel, the Commission determined Eastern is a public utility pursuant to 26 *Del.C.* § 102(2) and, therefore, subject to regulation by the Commission with regard to the eleven direct-sale customers located in Delaware.

On February 19, 1992, Eastern filed a Notice of Appeal in the Court of the Commission's order. The Court granted Eastern's motion to stay enforcement of the order pending this appeal on March 20, 1992. On April 15, 1992, Delmarva moved for leave to file a brief as *amicus curiae,* and this motion was granted.

### The Commission's Findings of Fact

Eastern was incorporated under the laws of this State as a wholly-owned subsidiary of Chesapeake in March 1955. In 1957, Eastern Shore filed an application for a Certificate of Public Convenience and Necessity with the Federal Power Commission ("FPC") to create and direct an interstate natural gas pipeline from Parkesburg, Pennsylvania to Salisbury, Maryland.[3]

Eastern initially applied to serve several sales-for-resale customers and one direct-sales customer. The FPC rejected Eastern's application on the grounds that such an arrangement was not economically viable. Eastern then selected a group of high-volume industrial customers whose special needs and natural gas requirements could not be met by the existing facilities of the local distribution company. This group was included as direct-sale customers in Eastern's application for a Certificate of Public Convenience and Necessity. The FPC approved Eastern's application, and operation of the pipeline commenced in 1959.

From 1959 to 1965, Eastern entered into individual contractual agreements to service several high-volume industrial direct-sales customers. In each case, Eastern received authorization from the FPC or its successor, the FERC, prior to providing natural gas service. At present, Eastern provides natural gas service to thirteen direct-sales customers. Eleven direct-sale customers are located within the State of Delaware, and two are located in Maryland. Of the eleven direct sale customers located in Delaware, seven are located within Chesapeake territory. The other four customers, including Formosa, are located within Delmarva territory. While Eastern has not accepted any new direct-sale customers since 1965, it does not purport to limit itself to the direct-sale customers it currently serves.

In 1990, Eastern's eleven direct-sale customers within Delaware consumed approximately 283,000 cubic feet ("Mcf") of natural gas. In contrast, the eleven largest retail customers of Chesapeake's Delaware Division consumed an average of 38,000 Mcf.

The Commission has not received any complaints concerning the direct-sales activities of Eastern. In addition, other than the dismissed complaint of Formosa, no utility company has sought Commission intervention.

### The Commission's Conclusions of Law

The Commission determined Eastern was a public utility based on a "public interest" construction of the phrase "for public use" contained in the 26 *Del.C.* § 102(2) definition of "public utility." The Commission concluded that jurisdiction over Eastern was necessary due to Eastern's sale of natural gas, a typically regulated commodity, to companies autonomous from Eastern. The Commission reasoned such operations by Eastern affected the public interest to the extent of creating a "potential for 'destructive competition' with resulting adverse consequences for ... [a currently] existing [public] utility and its customers."

---

**3.** Since its inception, Eastern has been regulated by the FPC and its successor, the FERC, pursuant to the Natural Gas Act, 15 U.S.C. Ch. 15B. Under the Act, the federal government has exclusive jurisdiction over: (1) the sale for resale of natural gas in interstate commerce; (2) transpor-

tation of natural gas in interstate commerce; and (3) any natural gas company involved in the transportation or sales of natural gas. Federal regulation requires Eastern to seek approval from FERC for any modifications or additions to its service obligations.

In addition, the Commission also determined it was not federally preempted by FERC from regulating the rates charged by Eastern to its direct-sale customers. However, it elected to limit its regulatory supervision over Eastern as long as Eastern continues to demonstrate that any acquisition of new direct-sale customers remains consistent with the public interest and "does not rise to the level of injurious competition with another existing gas utility, including the Delaware Division of Chesapeake."

Nevertheless, the Commission ordered that a separate docket remain open for the purpose of determining to what extent Eastern should be regulated in the future. Pending resolution of the new docket, the Commission limited regulatory supervision to: (1) considering complaints by customers and other utilities concerning Eastern's service; (2) requiring Eastern to file its annual and periodic reports required of other regulated natural gas utilities; and (3) payment by Eastern of annual public utility assessments on gross interstate operating revenues. Finally, until such time that the Commission determines the extent of regulation necessary, the Commission restricted Eastern from taking any new service obligations or materially altering sales or services to existing customers without Commission authorization, except as authorized by the FERC.

### Standard of Review

■ The applicable standard of review is governed by the Administrative Procedures Act. 29 *Del.C.* § 10161(3); *Delmarva Power & Light Co. v. Public Service Commission*, Del.Supr., 508 A.2d 849 (1986). Therefore, on appeal of a decision from the Public Service Commission, this Court does not sit as a trier of fact with authority to weigh evidence, determine credibility, or make factual findings and conclusions. *Johnson v. Chrysler Corp.*, Del.Supr., 213 A.2d 64 (1965). The role of the Court is to determine whether substantial evidence exists on the record to support the Commission's factual findings and to correct errors of law. 29 *Del.C.* § 10142; *Chicago Bridge and Iron Co. v. Walker*, Del.Supr., 372 A.2d 185 (1977); *Johnson v. Chrysler Corp., su-*

*pra.* However, where the Commission's determination is based on the interpretation of a statute, a legal issue, and the application of the law to undisputed facts, the Court's review is plenary, and it is in no way bound by the Commission's conclusion. *Stoltz Management Co., Inc. v. Consumer Affairs Board*, Del.Supr., 616 A.2d 1205 (1992), *rearg. denied*, Del.Supr., No. 37, 1992, Walsh, J. (Nov. 10, 1992); *In the Matter of South Jersey Gas Co.*, N.J.Super.A.D., 544 A.2d 402 (1988). Nonetheless, the Court will afford substantial weight to the Commission's interpretation of a statute which it is charged with enforcing, provided said construction is not clearly erroneous. *Nationwide Mutual Insurance Co. v. Krongold*, Del.Supr., 318 A.2d 606 (1974); *Vassallo v. Haber Electric Co.*, Del.Super., 435 A.2d 1046 (1981); *South Jersey Gas Co.*, 544 A.2d at 405.

### Issues Presented

■ Because the Commission is a creature of the Delaware legislature, its powers are limited to those conferred by the legislature. *Public Service Commission v. Diamond State Telephone*, Del.Supr., 468 A.2d 1285 (1983). Section 201 of Title 26 of the Delaware Code confers upon the Commission "exclusive original supervision and regulation of all public utilities and also of their rates, property rights, equipment, facilities, service territories, and franchises so far as may be necessary for the purpose of carrying out the provisions of this title." 26 *Del.C.* § 201.

A "public utility" is defined in section 102(2) of Title 26 of the Delaware Code as follows:

"Public utility" includes every individual, partnership, association, corporation, joint stock company, agency or department of the State or any association of individuals engaged in the prosecution in common of a productive enterprise (commonly called a "cooperative"), ... that now operates or hereafter may operate, within this State, ... natural gas ... *for public use.*

26 *Del.C.* § 102(2) (emphasis added). Thus, whether the Commission may regulate Eastern's direct-sale operations as a public utility depends on whether Eastern is a public utility as defined in section 102(2). This, in turn,

is premised on a proper statutory interpretation of the phrase "for public use" as contained in the definition of "public utility."

Neither party disputes the well-recognized rule that, while Congress preempted state regulation of natural gas sales by enacting the Natural Gas Act, it intentionally left regulation of rates of direct sales of natural gas by public utilities to the states. *Panhandle Eastern Pipeline Co. v. Public Service Commission*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947); *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972) (Federal Power Commission has authority to regulate the volume of gas sold to direct sale customers, but may not regulate rates for those customers). Also at issue is whether the Commission's regulation encroaches upon what has been preempted by federal law.

### Contentions of the Parties

Eastern argues the phrase "for public use" entails the indiscriminate service or sale of a traditionally regulated product by a company to an indefinite public possessing the right to demand such services. Eastern relies on prior decisions of the Commission addressing the issue of what constitutes a "public utility," where the Commission concluded a company may only obtain public utility status upon a showing that it is "ready, willing and able to supply and sell water to all persons who need or desire it, without regard to their status or relation to [the company] itself." *Matter of Bayview Improvement Co. and its Status as a Public Utility*, PSC Docket No. 288 (May 4, 1990); *City of Dover v. Delaware Power & Light Co.*, PSC Docket No. 94, Order No. 182 (Dec. 30, 1953) ("public" means "the people, the whole body politic, or everybody, rather than an individual or even a group of individuals"). *In the Matter of First State Pipeline*, PSC Docket No. 524 (Feb. 14, 1968) (a company that limits its sales to direct sale customers did not hold itself out as ready to serve all who require its product and, therefore, was not a public utili-

ty). Thus, Eastern contends that utility status should not be given to a company that limits its customers to a certain number or type, regardless of whether it intends to acquire additional customers in the future, because of the discriminatory nature of its operations. *Coastal States Gas Transmission Co. v. P.S.C.*, Ala.Supr., 524 So.2d 357 (1988); *City of St. Louis v. Mississippi River Fuel Corp.*, 97 F.2d 726 (8th Cir.1938).[4] Because it does not serve indiscriminately an indefinite public, but limits its service to high-volume industrial end users, Eastern argues its operations do not rise to the level of public use and, therefore, are not subject to the jurisdiction of the Commission as a public utility.

The Commission disputes Eastern's interpretation of "for public use" and argues that, regardless of a company's decision to limit its operations to a select number of customers, whether a company's activities constitute "public use" depends on: (1) the nature of that company's relationship with its current customers; and (2) whether the company's activities affect the public interest in a manner creating a potential for adverse or destructive competition. The Commission contends that, notwithstanding Eastern's decision to limit itself to servicing only high-volume industrial direct-sale customers, Eastern's sale of natural gas to entities not wholly-owned by it constitutes "public use" and, therefore, affects the public interest in such a manner as to necessitate regulation of its activities.

### The Public Interest Standard

The Natural Gas Act, 15 U.S.C. § 717(a), specifically declares the business of transporting and selling natural gas for ultimate distribution to the public is affected with the public interest and, therefore, may be subject to regulation and control. 15 U.S.C. § 717(a); *Public Service Commission v. Panhandle Eastern Pipeline Co.*, Supr., 224 Ind. 662, 71 N.E.2d 117 (1947).[5]

---

**4.** *See also Mississippi River Fuel Corp. v. Illinois Commerce Commission*, 1 Ill.2d 509, 116 N.E.2d 394 (1953), and *Public Utilities Commission v. Colorado Interstate Gas Co.*, 142 Colo. 361, 351 P.2d 241 (1960).

**5.** Section 717(a) states in relevant part:
(a) As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Con-

Accordingly, a majority of jurisdictions have chosen to reject the indiscriminate-service-to-an-indefinite-public test and have placed greater emphasis on the public character of a company's operations and its effect on the public interest. The court in *Iowa State Commerce Commission v. Northern Natural Gas Co.*, Iowa Supr., 161 N.W.2d 111 (1968), in determining that Northern Natural Gas Company was a public utility, held that the jurisdictional statutory term "to the public" necessarily means the sale of natural gas to a sufficient portion of the public to clothe such operations with a public interest. It "does not mean willingness to sell to each and every one of the public without discrimination." *Id.* at 115. The court concluded:

> [I]t is not a controlling factor that the corporation supplying service does not hold itself out to serve the public generally ... [A] business may be so far affected with a public interest that it is subject to regulation as to rates and charges even though the public does not have the right to demand and receive service ... [Thus] a corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare, and interest subjects itself to regulation by the duly constituted governmental authority.

*Id.* at 114.[6]

The Minnesota Supreme Court in *Northern Natural Gas v. Minnesota Public Service Commission*, Minn.Supr., 292 N.W.2d 759 (1980), cited *Iowa State Commerce Commission v. Northern Natural Gas Co.* to support its conclusion that Northern Natural Gas' status as a public utility in Minnesota did not hinge on its refusal to hold itself out indiscriminately to serve an indefinite public. It held that, regardless of appellant's limited retail sales to direct-sale customers, the fact

that it did not fall within a statutory exception meant the legislature clearly intended to include appellant and any equivalent thereof within the definition of "public utility." *Id.* at 763. In addition, the court also found that the only obstacle preventing appellant from soliciting other large direct-sale customers was a mandate by the Federal Power Commission prohibiting further solicitation by appellant due to a decline in the supply of natural gas. If given the choice, however, the court concluded appellant would continue to solicit large direct-sale customers. Thus, the court concluded that what constitutes a public utility depends upon the particular facts in each case and on the public character of selling a traditionally regulated commodity. Finally, the court noted that the "rigid 'right of the public to demand service' test" was unrealistic in that a company afforded utility status does not lose its status merely because a sector of the public may be prohibited from demanding services from that company due to lack of supply. *Id.* at 763.

In *Southwest Gas*, the court accurately stated:

> [T]he purposes of regulation are to preserve and promote those services which are indispensable to large segments of our population, and to prevent excessive and discriminatory rates and inferior service where the nature of the facilities used in providing the service and the disparity in the relative bargaining power of a utility ratepayer are such as to prevent the ratepayer from demanding a high level of service at a fair price without the assistance of governmental intervention in his behalf.

*Southwest Gas Corp. v. Arizona Corp. Commission*, App., 169 Ariz. 279, 286, 818 P.2d 714, 721 (1991), citing *Re Geldbach Petroleum Co.*, 56 P.U.R.3d 207, 213 (Mo.1964).

gress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public *is affected with a public interest,* and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and a foreign commerce *is necessary in the public interest.*

15 U.S.C. § 717(a) (emphasis added).

6. *See also Public Service Commission v. Panhandle Eastern Pipeline Co.*, Ind.Supr., 224 Ind. 662, 117 N.E.2d 117, 127 (1947) (where overall public character of a company's unregulated transactions within the State of Indiana impermissibly allowed company to compete with local public utilities in soliciting industrial business, while discriminating in its service, rates and regulations).

Thus, while free enterprise and competition is the general rule, where a company engages in the sale of a product deemed to be affected with the public interest, the government's right to regulate that company's activities to protect the consuming public outweighs the company's right to be free from the constraints of such regulation. *Id.* 169 Ariz. at 286, 818 P.2d at 721.[7]

Although this issue is novel to Delaware courts, the Commission has indicated a similar pervasive concern for the public interest when determining whether a particular company has obtained public utility status.

In *The Matter of Bayview Improvement Co. and its Status as a Public Utility,* PSC Docket No. 288 (May 4, 1960), the Commission determined that Bayview Improvement Co., by supplying water service to persons other than its own lessees and stockholders, was a public utility subject to regulation. In doing so, the Commission noted that the Public Service Commission Act was a remedial statute designed to restrict unchecked competition between the utilities and to provide a redress for wrongs inflicted upon persons dependent on a utility's services. The Commission further noted that, because the Act was remedial in nature and, therefore, entitled to liberal construction, any exemption therefrom would be strictly construed. Although the Commission chose at that time to apply the "indiscriminate service to an indefinite public" test, or "public use" test, the Commission's liberal construction of the Act to assert jurisdiction over Bayview Improvement Company in order to prevent it from discontinuing water service to a customer[8] infers an overall concern by the Commission of the need to protect the public interest.

In *The Matter of First State Pipeline Co.,* PSC Docket No. 524 (Feb. 14, 1968), the Commission expressly stated, "In attempting to assess the legislative intent we must, of necessity, begin with the legislative purpose. This purpose we believe was obvious: to place under state regulation those businesses so affected with the public interest that the rates for, and extent of, their services could not be privately determined." *Id.* at 8.

Similarly, the Delaware Supreme Court has recognized that enactment of regulatory laws limiting competition between utility companies was a legislative remedy to balance the interests of the public with those of the utility company. Such a policy resulted from "many years of unhappy experience with the evils of uncontrolled monopoly, and the resulting ills visited on the public by speculative schemes, unwarranted competitive practices and unsatisfactory services." *First State Pipeline, Delmarva Power & Light v. Seaford,* Del.Supr., 575 A.2d 1089, 1096, 1097 (1990).

Thus, the Court is not convinced the "public use" test, which requires indiscriminate service to an indefinite public, adequately addresses the need to protect the public interest from the potential adverse consequences caused by the unregulated sale of natural gas. It is clear that, regardless of what test is applied when construing the term "for public use," the central issues that must be answered is whether the activities in question may have or not have a significant impact on the public interest the Commission was designed to protect. This concern requires the Court to examine the potential effects of natural gas sales by an unregulated company upon the public interest when determining whether such activity rises to the

---

7. Southwest Gas Corp. filed a complaint with The Arizona Corporation Commission asserting that El Paso Natural Gas Co. was a "public service corporation" as defined in Arizona's jurisdictional statute. Upon the Commission's determination that El Paso was not subject to regulation as a "public service corporation," considering El Paso's intention not to solicit any new direct-sale customers in Arizona, Southwest Gas commenced an action in superior court seeking to modify or set aside the Commission's order as "unreasonable and unlawful." *Id.* 169 Ariz. at 281, 818 P.2d at 716.

8. Bayview Improvement Co. provided water service to the Liston Front Range Lighthouse, owned and occupied since 1954 by Mrs. Richard Herbert. (The Lighthouse has never been owned or occupied by Bayview Improvement Co.) After certain misunderstandings occurred between Mrs. Herbert and Bayview, Bayview notified Mrs. Herbert it would be discontinuing water service to the Lighthouse. *Id.* at 14.

level of "public use," regardless of the number or type of customers serviced.

■ Eastern asserts that the adoption of the "public interest" test improperly broadens the regulatory powers granted to the Commission by permitting the Commission to assert jurisdiction over a company that does not provide services to the general public merely because it sells a product affected with the public interest. I disagree. Section 203A(a)(1) of Title 26 of the Delaware Code specifically empowers the Commission to grant or deny Certificates of Public Convenience and Necessity at its discretion in order to limit competition between utility companies.[9] Similarly, section 203A(b)(3) provides that the Commission may "define or limit the territory or territories in this State within which the activities authorized by the certificate may be conducted." 26 *Del.C.* § 203A(b)(3). In addition, the State legislature has enacted 26 *Del.C.* § 201(c), which expressly gives the Commission the discretion to refrain from normal supervision and regulation of public utility services and to revoke or reverse such forbearance where the Commission deems it necessary or appropriate to better serve the public interest.[10] The enactment of section 201(c), coupled with sections 203A(a)(1) and (b)(3), indicates to the Court that the legislature specifically created the Commission for the purpose of balancing the interests of the consuming public with those of regulated companies and, accordingly, conferred broad discretionary power upon the Commission to certify or not certify a company for purposes of regulation. *Delmarva Power & Light Co. v. City of*

*Seaford,* Del.Supr., 575 A.2d at 1097. The Commission accurately states:

> It is impossible for the Public Service Commission to monitor and effectively control the extent of competition in the provision of traditionally regulated commodities if an unregulated firm with no obligation to serve all similarly situated customers and without general obligation to provide service to all who require it in a specific territory can essentially enter the public utility business and "cherry pick" or "cream skim" away the existing utility's highest volume customers.

> The absence of such ability to regulate the extent of competition creates the potential for "destructive competition" with resulting adverse consequences for the existing utility and its customers.

*In the Matter of Eastern Shore Natural Gas Co.,* PSC Docket No. 92–2, Order No. 3372 (Feb. 11, 1992.)

■ Eastern is engaged in the sale of natural gas to eleven direct-sale industrial companies, all of which are not tenants or wholly-owned subsidiaries of Eastern. Thus, Eastern's activities are far from being exclusively private and naturally affect the public interest to a large extent. Congruous with this is the fact that, in 1990, Eastern sold 283,000 Mcf of natural gas to its eleven direct-sale customers, while its parent company, Chesapeake, sold only 38,000 Mcf to its eleven largest customers. In addition, although it has not acquired additional customers since 1965, the possibility remains that

9. Section 203A(a)(1) states in relevant part:
 Subject to the provisions of subsection (b) of this section and §§ 102, 201, and 202 of this title, no individual, copartnership, association, corporation, joint stock company, agency or department of the State, cooperative, or the lessees, trustees or receivers thereof, shall begin the business of a public utility nor shall any public utility begin any extension of its business or operations without having first obtained from the Commission a certificate that the present or future public convenience and necessity requires or will require the operation of such business or extension.
 26 *Del.C.* § 203A(a)(1).

10. Section 201(c) of Title 26 of the Delaware Code states:

> In the exercise of exclusive original supervision and regulation over public utilities, the Commission may, where it determines after notice and hearing that the public interest will be better served by the competitive provision of 1 or more public utility services, forbear from its normal supervision and regulation over such services and over some or all of the providers thereof to the extent the Commission deems necessary to promote and sustain adequate service at just and reasonable rates through the competitive provision of such services. The Commission may also revoke or reverse such forbearance where deemed necessary or appropriate in the public interest.
> 26 *Del.C.* § 201(c).

Eastern may elect to do so in the future. Thus, there is potential for adverse competition which may affect the public interest. The fact that Eastern sells natural gas to companies not wholly-owned by it and possibly may acquire additional similar customers in the future, demonstrates that the potential for adverse competition is substantial, and Eastern's activities with regard to the rates it charges it direct-sale customers should be regulated to prevent a potential breakdown of the rate structures of those utilities already under Commission jurisdiction.

■ The Court finds Eastern's argument that it is a private company, since the general public may not demand its services, is without merit. If the Court were to accept this view, it would permit Eastern to circumvent the confines of 26 *Del.C.* § 102(2) by proclaiming it would not sell to certain customers and, thus, avoid compliance with the law. *Petition of South Jersey Gas Co.,* N.J.Super.A.D., 544 A.2d 402, 406 (1988). In addition, conceding to a "public use" exception would encourage other companies to enter the jurisdiction with the intent of entering into contracts on a one-to-one basis with other industrial direct-sale users, which would radically alter the regulatory scheme established by the legislature of this State. Essentially, "revenue that otherwise would have gone to the regulated utilities which serve the affected areas would be diverted to unregulated producers. This revenue would have to be made up by the remaining customers of the regulated utilities since the fixed costs of the regulated systems would not have been reduced." *PW Ventures, Inc. v. Nichols,* Fla.Supr., 533 So.2d 281, 283 (1988) (court held that the phrase "to the public" meant to "any member of the public" and, therefore, concluded company which sold electricity to a single customer not wholly-owned by that company is subject to regulation by the Public Service Commission of Florida). Thus, regardless of whether a company sells to less than the general public, the Court finds that, where that company engages in the sale of a regulated commodity to others, the Commission is empowered by the legislature to assert jurisdiction over that company for the purposes of regulation. As the court in *South Jersey* accurately stated:

Public utility status ... should not depend on whether a company is serving a certain number of customers or indiscriminately 'holding out' service to a broad segment of the public to a broad segment of the public.

\* \* \* \* \* \*

Such a determination has to be based on the *potential* effect of such operations on the regulated milieu without regard to its actual scope if the Board is to discharge its statutory duties.... On balance such a public interest determination is a logical and reasonable method of determining public use, given the goal of the Legislature in authorizing the Board to regulate such activities. To hold otherwise would be to permit private companies to use equipment described in the enabling statute ... to potentially wreak havoc with the Board's regulation of such activities, all to the ultimate detriment of the public which the Board was created to serve.

*Petition of South Jersey Gas Co., supra* at 407–408.

■ Finally, Eastern's argument that it cannot be a public utility because it is not equipped with the necessary facilities to serve the general public is without merit because the absence of this ability does not bar a finding of the statutory public use.

### The Commission's Past Rulings On Jurisdiction

■ Eastern relies on *Peoples Energy Corp. v. Illinois Commerce Commission,* 142 Ill.App.3d 917, 97 Ill.Dec. 115, 492 N.E.2d 551 (1986), to contend the Commission's failure to assert jurisdiction during the last 35 years of Eastern's existence is indicative of the Commission's belief that it did not have authority under 26 *Del.C.* § 102(2) to regulate Eastern's activities. The court in *Peoples Energy Corp.* concluded that the Commission's failure to assert jurisdiction over Peoples Energy Corp. for 14 years was a factor which could not be overlooked in determining whether Peoples Energy Corp. was a public utility. However, the court also noted:

We recognize the Commission is not bound by principles of res judicata ... and that its prior failure to treat Peoples Energy as a public utility, standing alone, would not be determinative of Peoples Energy's status.

*Id.* 97 Ill.Dec. at 125, 492 N.E.2d at 561. The court then applied a "public use" test and determined that Peoples Energy Corp. was not a public utility due to Peoples Energy Corp.'s refusal to supply service to all persons alike, without discrimination, coupled with the Commission's prior failure to assert jurisdiction.

Because this Court has rejected the "public use" test, the discriminatory nature of Eastern's sale of natural gas does not control whether Eastern is a public utility. Therefore, while the Commission's failure to assert jurisdiction over Eastern is a factor which may be taken into account, it must be considered in conjunction with the overall regulatory nature of Eastern's operations and the potential effect such operations may have on the public interest.

 An agency is not forever bound by its prior determinations and may change its mind if such change will aid it in accomplishing an appointed task, since its view of what is in the public interest may change, even if the circumstances do not. *City of Alma v. U.S.,* 744 F.Supp. 1546, 1561 (S.D.Ga.1990); *Motor Vehicle Manufacturers Ass'n. v. State Farm Mutual Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("But the forces of change do not always point in the direction of deregulation ... there is no more reason to presume that changing circumstances require the rescission of prior action, instead of a revision in or even the extension of current regulation"). However, when an agency departs from prior precedent or decisions, it "must either distinguish or rationally explain its departure." *Id.* at 1562, citing *Acadian Gas Pipeline Sus. v. FERC,* 878 F.2d 865, 868 (5th Cir.1989). The Court will uphold the agency's decision if it reasonably explains why its new policy or position achieves the objectives of the relevant statute as well or better than the old policy. *Id.* at 1561, citing *New York Council Ass'n. of Civil Technicians v. Federal Labor Relations Authority,* 757 F.2d 502, 508 (2d Cir.1985). Accordingly, the court finds the Commission's explanation that "to fulfill its responsibility under 26 *Del.C.* § 202(c) (sic) permitting competition while protecting the public interest, the PSC must be in a position to prevent competition with public utilities where to do so would be in the public interest, as well as to promote and foster competition where the public would thereby benefit," to be reasonable and valid.

### The Federal Preemption Issue

 The Natural Gas Act states in relevant part:

(b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, *to the sale in interstate commerce of natural gas for resale* for ultimate public consumption for domestic, commercial industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.*

15 U.S.C. § 717(b) (emphasis added). Eastern argues that the Commission's decision is an attempt to regulate Eastern's activities which are subject to exclusive federal regulation under the FERC. The Commission, however, clarified its position and acknowledges in its answering brief that jurisdiction over Eastern is limited for the purpose of regulating the rates charged by Eastern to its direct sales customers. The Court's understanding of the Commission's decision that "Eastern Shore may not take on new direct sale customers, nor materially alter sales or service to existing customers, without this Commission's authorization except to the extent permitted by Order of the Federal Energy Regulatory Commission," is that it is fully aware of its limitations and does not intend to encroach upon regulations imposed by the FERC. *In the Matter of Eastern Shore Natural Gas Co.,* PSC Docket No. 92–2, Order No. 3372 (Feb. 11, 1992). With this acknowledgement, the court finds no error or law by the Commission on this issue.

### *Conclusion*

For the foregoing reasons, the Court finds that there is substantial evidence to support the findings below and that there was no error of law. Accordingly, the decision of the Delaware Public Service Commission is affirmed.

### ORDER

This 19th day of February, 1993, the Court having issued its opinion this date, and for the reasons assigned therein, **IT IS OR-DERED** that the decision of the Public Service Commission that Eastern Shore Natural Gas Company is a public utility for purposes of asserting jurisdiction is **AFFIRMED.**