# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE DELAWARE DIVISION OF THE PUBLIC ADVOCATE, | ) ) ) | |
| Appellant, | ) ) ) | |
| v. | ) ) | C.A. No.: K22A-02-005 RLG |
| THE DELAWARE PUBLIC SERVICE COMMISSION and DELMARVA POWER & LIGHT COMPANY, | ) ) ) ) ) ) | |
| Appellees. | ) | |

## MEMORANDUM OPINION AND ORDER

**Submitted: November 4, 2022**
**Decided: March 24, 2023**

*Upon Appellant's Appeal from a Decision of the*
*Delaware Public Service Commission* – **REVERSED AND REMANDED.**

Regina A. Iorii, Esquire, Department of Justice, Wilmington, Delaware, *Attorney for Appellant.*

James McC. Geddes, Esquire, Ashby & Geddes, Wilmington, Delaware, *Attorney for Appellee The Delaware Public Service Commission.*

Jessica M. Jones, Esquire & Marisa R. De Feo, Esquire, Saul Ewing Arnstein & Lehr LLP, Wilmington, Delaware, *Attorney for Appellee Delmarva Power & Light Company.*

**GREEN-STREETT, J.**

## Introduction

The instant appeal stems from The Delaware Public Service Commission's ("Commission") decision to grant Delmarva Power & Light Company's ("Delmarva") request to include its Prepaid Pension Asset ("PPA") and liability for Other Post-Retirement Employment Benefits ("OPEB") within its rate base. Citing precedent, the Commission found that the PPA and OPEB liability balances should be included in Delmarva's rate base. The Delaware Division of the Public Advocate ("DPA"), an entity created by the General Assembly to advocate on behalf of residential and small commercial utility customers,[1] contends that the Commission's finding is not supported by substantial evidence and constitutes legal error. For the reasons set forth below, the Commission's decision is reversed and remanded.

## Background

This case involves the inimitable and complicated intersection of utility law and accounting. While largely undisputed, the complexity of some of the underlying concepts and principles of this case compels the Court to provide an overview of the relevant facts, terminology, and procedural history. All accounting principles referenced conform to Generally Accepted Accounting Principles ("GAAP") and Financial Accounting Standards ("FAS").

---

[1] 29 Del. C. §§ 8716(e)(1) & (2).

## A. Delaware's Utility Regulatory Scheme

Delmarva is a Delaware public utility[2] company regulated by the Commission. Under the Delaware Public Utilities Act[3] (the "Act"), the Delaware General Assembly delegated to the Commission the exclusive authority to regulate Delaware public utilities.[4] This Court has held that the Delaware legislature specifically created the Commission for "the purpose of balancing the interests of the consuming public with those of regulated companies."[5] Delaware public utilities are prohibited from imposing any "unjust or unreasonable or unduly deferential or unjustly discriminatory individual or joint rate."[6] These utilities must notify the

---

[2] 26 Del. C. § 102(2) (A public utility is defined as every individual, partnership, association, corporation, joint stock company, agency or department of the State or any association of individuals engaged in the prosecution in common of a productive enterprise (commonly called a "cooperative"), their lessees, trustees or receivers appointed by any court whatsoever, that now operates or hereafter may operate for public use within this state, (however, elective cooperatives shall not be permitted directly or through an affiliate to engage in the production, sale or distribution or propane gas or heating oil), any natural gas, electric (excluding electric suppliers as defined in § 1001 of this title), water, wastewater (which shall include sanitary sewer charge), telecommunications, (excluding telephone services provided by cellular technology or by domestic public land mobile radio service) service, system, plant or equipment.)

[3] See, e.g., 26 Del. C. §§ 102, 201, 304-305.

[4] 26 Del. C. § 201.

[5] Chesapeake Util. Corp. v. Delaware Pub. Serv. Comm'n, 2017 WL 2480804, at *3 (Del. Super. June 7, 2017) (citing E. Shore Nat. Gas Co. v. Del. Pub. Serv. Comm'n, 635 A.2d 1273, 1277 (Del. Super. Feb. 19, 1993)) (additional citations omitted).

[6] Id. at *3 (citing 26 Del. C. § 303).

Commission if any rate change is sought.[7]  The Commission is then statutorily authorized to conduct hearings.[8]

## B. Legal Principles Governing Rate Cases

The primary purpose of ratemaking is to fix rates sufficient to give the utility a fair return upon the present value of property dedicated to the public use.[9]  When the Commission considers the lawfulness of any rate change, it must review a utility's rate base and how that rate base is calculated.  "Ratemaking is commonly considered an art, not a science."[10]

### 1. Rate Base

Rate base is "the dollar value of the utility's plant employed in providing its service to the public and upon which the utility and its investors are entitled to earn a fair return."[11]  The rate base is, in effect, the investment upon which the investors' return is earned.[12]  The Act outlines the components of a Delaware-regulated utility's rate base, which includes:

---

[7] 26 Del. C. § 304(a).

[8] 26 Del. C. § 305.

[9] Chesapeake Util. Corp. v. Del. Pub. Serv. Comm'n, 705 A.2d 1059, 1065 (Del. Super. Mar. 31, 1997).

[10] Id.

[11] Id. at 1066.

[12] Id.

a. The original cost of all used and useful utility plan and intangible assets either to the first person who committed said plant or assets to public use or, at the option of the Commission, the first recorded book cost of said plant or assets; less

b. Related accumulated depreciation and amortization; less

c. The actual amount received and unrefunded as customer advances or contributions in aid of construction of utility plant, and less

d. Any accumulated deferred and unamortized income tax liabilities and investment credits, adjusted to reflect any accumulated deferred income tax assets including, but not limited to, those arising from the payment of alternative minimum tax, related to plant included in paragraph a. above, plus

e. Accumulated depreciation of customer advances and contributions in aid of construction related to plant included in paragraph a. above, and plus

f. Materials and supplies necessary to the conduct of the business and investor supplied cash working capital, and plus

g. Any other element of property which, in the judgment of the Commission, is necessary to the effective operation of the utility.[13]

A utility's rate base, in essence, is determined by adding the utility's investment in physical properties to its working capital.

## 2. **Working Capital**

Working capital constitutes the operating funds essential to pay for the current obligations of a utility.[14] Stated another way, working capital is the money – fronted by the utility – necessary to finance the services provided until the utility is compensated by its customers.[15] As expertly outlined by the New Mexico Supreme Court:

> In the context of utility regulation, working capital does not include the total liquid funds with which the business is conducted. It is not the property which the business has; that is, it is not the excess of current assets over current liabilities. Working capital, rather is an allowance for the sum which the company needs

---

[13] 26 Del. C. § 102(3).

[14] N.M. Atty Gen. v. N.M. Pub. Regul. Comm'n, 359 P.3d 133, 138 (N.M. 2015).

[15] Id.

to supply from its own funds for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently.[16]

When a utility cannot timely use the money it receives from approved rates to pay for its operating expenses, a type of "deficit" exists that requires "cash working capital" ("CWC").[17] The utility must find an alternate way to obtain money to pay its operating expense needs.[18]

### 3. PPA & OPEB Liability Balances

The Employment Retirement Income Security Act of 1974 ("ERISA") and Pension Protection Act of 2006 (the "Pension Act") establish funding requirements to provide benefit security for retirees by protecting pension plan assets.[19] Employers must maintain plan funding at a certain level to meet their federal obligations.[20] Employers fund their plans with cash contributions or investments.[21] All contributions to pension plans are placed into separate trust accounts, to which

---

[16] Id.

[17] Commission's Answering Br., 1-2.

[18] Id. at 2.

[19] In the Matter of Public Utility Commission of Oregon's Investigation into Treatment of Pension Costs in Utility Rates, Docket No. UM 1633, Order No. 15-226, 2 (Aug. 3, 2015).

[20] Id.

[21] Id.

employers do not have access. Employers cannot use these funds to provide utility service to their customers.[22]

Since 1987, employers have been required to use FAS Number 87 ("FAS 87") for financial reporting of pension costs.[23] Because FAS 87 requires employers to recognize their pension plan costs on an actuarial accrual, pension costs are recognized over the working years of the employees that will receive the benefits.[24] Actuaries determine the amounts to contribute to the plans, designed to meet specific, federally-driven targets.[25]

Annual pension fund expenses can be positive or negative.[26] When a fund's annual investment gains exceed the annual actuarial costs, the FAS 87 annual expense becomes negative.[27] When the fund's annual actuarial costs are greater than the annual expected return on assets, the FAS 87 annual expense turns positive.[28] Cash contributions and negative expenses – the result of investment gains greater

---

[22] Id.

[23] Id.

[24] Id.

[25] Id. at 3.

[26] Id.

[27] Id.

[28] Id.

than actuarial costs – increase the fund's balance, while positive expenses decrease the fund's balance.[29]

ERISA and the Pension Act's funding obligations require employers to make plan contributions that are different than their recorded FAS 87 expense in a given year.[30]  If cumulative contributions exceed cumulative FAS 87 expenses, which may be negative due to investment gains, the difference is recorded as PPA.[31]  Thus, PPA arises when accumulated investor-supplied contributions in pension plan assets exceed the accumulated costs associated with pension obligations – which are used to determine pension costs included in consumers' rates.[32]  Because there can be no withdrawal from a PPA balance for any operational needs, an employer must fund its other actual cash expenses with investor-supplied capital.[33]  In sum, pension contributions in excess of pension costs – PPA – represent a CWC.

OPEB liability reflects the accumulated costs associated with OPEB obligations – e.g., retiree medical benefits – exceeding the associated accumulated investor-supplied contributions.[34] OPEB liability functions similarly to PPA

---

[29] Id.

[30] Id.

[31] Id.

[32] Delmarva's Answering Br., 5.

[33] Id.

[34] Id.

liability. Both PPA and OPEB liability create a time-lagged deficit that requires a utility to seek additional money to meet its operating expenses.

## C. **Procedural Posture**

On March 6, 2020, Delmarva filed an application (the "Application") with the Commission requesting an overall rate increase of $24.3 million. The Application represented Delmarva's first application for an electric rate base increase in three years – and its first contested application since 2013. DPA filed a Statutory Notice of Intervention related to the Application on March 9, 2020, and thereafter participated as a party in interest.

The Commission assigned a Hearing Examiner to conduct evidentiary hearings and present proposed findings of fact and conclusions of law to the Commission. Evidentiary hearings were held before the Hearing Examiner in February 2021. On June 25, 2021, the Hearing Examiner issued his proposed findings and recommendations (the "Recommendation"). For purposes of this appeal, the Recommendation's most noteworthy suggestion was to remove the PPA and OPEB liability balances from Delmarva's rate base.

Delmarva filed an exception to the Recommendation on July 10, 2021. Other exceptions to the Recommendation were filed on issues unrelated to the inclusion of the PPA and OPEB liability balances. The Commission heard oral argument on all exceptions on August 4, 2021. The Commission rejected the Recommendation that

the PPA and OPEB liability balances be excluded from Delmarva's rate base. On January 26, 2022, through Order No. 9953 ("Order 9953"), the Commission granted Delmarva an increase of $16.7 million to its electric base distribution rates. The PPA and OPEB liability balances were included in the rate base. DPA filed the instant appeal of Order 9953 in this Court on February 24, 2022.

## Standard of Review

Under 26 Del. C. § 510, final orders of the Commission are appealable to the Superior Court. Although the subject of great debate amongst the parties, the standard of review to be employed by this Court is settled. On appeal from an administrative agency, this Court must determine whether the agency ruling is supported by substantial evidence and free from legal error.[35] Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36] Thus, "[this] Court does not independently weigh the evidence, determine questions of credibility[,] or make its own factual findings."[37]

---

[35] Pub. Water Supply Co. v. DiPasquale, 735 A.2d 378, 381 (Del. 1999).

[36] Lorah v. Home Helpers, Inc., 21 A.3d 596, 2011 WL 2112739, at *2 (Del. May 26, 2011) (TABLE) (citing Oceanport Indus., Inc. v. Wilmington Stevedores, Inc., 636 A.2d 892, 899 (Del. 1994)); see also Lively v. Dover Wipes Co., 2003 WL 21213415, at *1 (Del. Super. May 16, 2003) (quoting Onley v. Cooch, 425 A.2d 610, 614 (Del. 1981) (defining "substantial evidence" as "more than a scintilla but less than a preponderance[.]")).

[37] Lorah, 2011 WL 2112739, at *2 (citing Johnson v. Chrysler Corp., 213 A.2d 64, 66 (Del. 1965)).

Rather, this Court "merely determines if the evidence is legally adequate to support the agency's factual findings and whether errors of law exist."[38]

When the issue for the Court's consideration is one of statutory construction, the Court's review is plenary.[39] The Delaware Supreme Court, in DiPasquale, unequivocally pronounced that "statutory interpretation is ultimately the responsibility of the courts."[40] "A reviewing court may accord due weight, but not defer to an agency interpretation of a statute administered by it."[41] In short, questions of statutory interpretation are legal questions, which this Court reviews *de novo*.

## Discussion

Although an issue of first impression for this Court, Order 9953 represents the third time the Commission addressed the issue of whether to include PPA and OPEB in a regulated utility's rate base. In 2006 and 2014, the Commission issued Orders

---

[38] Molinaro v. Unemployment Ins. Appeal Bd., 2004 WL 2828048, at *1 (Del. Super. May 14, 2004) (citing 19 Del. C. § 3323).

[39] DiPasquale, 735 A.2d at 381.

[40] Id. at 382.

[41] Id.

6930[42] and 8589,[43] respectively, allowing Delmarva to include PPA in its rate base. These prior Commission orders establish certain decision-making baselines for the Commission and must be duly examined.

## A. The Commission's Prior Consideration of PPA and OPEB's Inclusion in Rate Base

### 1. Order 6930 ("Docket No. 05-304")

From 1995 through 2008, Delmarva investors did not contribute any capital to the pension plan. The pension fund was sustained by high investment returns. This non-cash pension cost accrual created a negative pension expense. This negative pension expense reduced Delmarva's cost of service revenue requirement, which necessitated investor contributions of cash payments to fund Delmarva's operating expenses.

During this time, in 2006, while the pension expense was negative, the Commission was asked to consider inclusion of the PPA and OPEB liability balances in the rate base. The Commission permitted their inclusion in rate base by Delmarva. The Commission explained this inclusion as follows:

> [t]he prepaid pension asset is appropriately included
> in rate base because it is caused by a negative pension

---

[42] In the Matter of the Application of Delmarva Power & Light Company for Approval of a Change in Electric Distribution Base Rates and Miscellaneous Tariff Changes, PSC Docket No. 05-304, Order No. 6930 (June 6, 2006)(hereinafter "Order No. 6930").

[43] In the Matter of the Application of Delmarva Power & Light Company for an Increase in Electric Distribution Rates and Miscellaneous Tariff Changes, PSC Docket No. 13-115, Order No. 8589 (Aug. 5, 2014)(hereinafter "Order No. 8589").

expense, which both reduces base rates, resulting in rates that are lower than they otherwise might be, and[,] at the same time[,] creates a cash working capital requirement. We also recognize that [Delmarva] has no access to this asset to use for other operating expenses; it is precluded by federal tax law from using any of the money it has collected for pensions for any other purpose.[44]

The Commission found that Delmarva had a CWC requirement because of the negative pension expense. The Commission's decision centered around rate reduction and creation of a CWC requirement.

## 2. Order 8589 ("Docket No. 13-115")

Due to an economic downturn, the pension fund could not continue to be sustained solely by its investment returns. Unlike the preceding fourteen years, the PPA balance arose from both returns on plans investments and contributions from Delmarva's shareholders from 2009 through 2019. Specifically, during this ten-year period, Delmarva shareholders contributed $167 million to the pension plan.[45] Despite these contributions, the value of the plan assets decreased by slightly over

---

[44] Order No. 6930, ¶ 58 (June 6, 2006).

[45] In the Matter of the Application of Delmarva Power & Light Company for Application for an Increase in Electric Base Rate, PSC Docket No. 20-0149, Direct Testimony of Glenn A. Watkins, 40 (Sept. 9, 2020).

ten million dollars.[46]  Because the plan's annual returns were lower than its actuarial

costs, Delmarva began incurring positive pension expense.

Again, in 2014, this time while the pension expense was positive, the

Commission was asked to consider inclusion of the PPA and OPEB liability balances

in Delmarva's rate base.   With very little analysis or explanation of its decision, the

Commission determined that it was proper to include these balances in Delmarva's

rate base.  In Order 8589, the Commission simply provided:

> . . . [t]his issue is not as fully developed on this record
> as we would like.  It is a complicated issue, and we
> appreciate that the parties have tried to enlighten us
> on the nuances of the arguments that underlie their
> various positions but we note that we have allowed
> this adjustment in at least one of the prior Delmarva
> cases when it was objected to, and although we could
> remand this back to the Hearing Examiner to develop
> the record further, as one Commissioner suggested,
> we have decided not to do that and to include these
> two items in rate base.[47]

The Commission proffered no explanation as to how the now positive pension

expense affected its decision.  The Commission tendered no explanation as to how

rate reduction factored into its decision.  The Commission provided no discussion –

or mention – of any consideration of CWC.

---

[46] Id. at 42.

[47] Order No. 8589, ¶ 99. (Aug. 5, 2014).

15

**B. The Commission's Decision Is Not Supported by Substantial Evidence**

This Court considers Order 9953 consistent with the limited scope of this Court's standard of review and in the context of the Commission's prior Orders on this issue. In permitting the inclusion of PPA and OPEB liability balances in Delmarva's rate base in Order 9953, the Commission simply states:

> We have addressed this issue in two previous Delmarva cases, Docket Nos. 05-304 and 13-115, and[,] in each instance[,] we found it was appropriate that the PPA and OPEB liability balances be included in rate base. In this case, we believe that precedent should be followed, and[,] therefore[,] reject the Hearing Examiner's recommendation.[48]

The Commission does not outline the rationale for its rejection of the Hearing Examiner's recommendation. The Commission does not articulate any basis for its decision. The Commission offers no findings of fact and makes no conclusions of law.

"Although [this Court's] standard of review of a decision by [an administrative agency] is deferential, it is not altogether without teeth."[49] Thus,

---

[48] In the Matter of the Application of Delmarva Power & Light Company for an Increase in Electric Base Rates and Other Miscellaneous Tariff Changes, PSC Docket No. 20-0149, Order No. 9953, ¶ 102 (Jan. 26, 2022).

[49] Neece v. Unemployment Ins. Appeal Bd., 2022 WL 130870 at *4 (Del. Super. Jan. 14, 2022) (citing Murphy & Landon P.A. v. Pernic, 121 A.3d 1215, 1217 (Del. 2015)).

although this Court may not make its own factual determinations or weigh the credibility of witnesses, it cannot defer to a decision by an agency or board that fails to reflect a rational consideration of the evidence.[50] As noted by this Court and the Delaware Supreme Court, "[an administrative agency] cannot simply ignore substantial and relevant evidence without an explanation."[51] The record provided to the Court, and the Commission's opinion within it, fails to address, without any explanation, its decision to reject the Hearing Examiner's recommendation and include PPA and OPEB in rate base.

It is outside of this Court's authority to make its own factual determinations in the evaluation of a lower court or administrative agency's appeal.[52] Rather, the Court must base its decision on appeal by examining the record below to determine whether substantial evidence supports the Commission's findings. In doing so, the Court "will not intrude on [the Commission's] role as trier of fact by disturbing the [Commission's] credibility determinations or factual findings."[53] However, the

---

[50] Id.

[51] Id. (citing Igo v. ACTS Ret. Life Communities, 2021 WL 37461, at *4 (Del. Super. Jan. 5, 2021) (additional citations omitted)).

[52] Sutton v. Unemployment Ins. Appeal Bd., 2010 WL 1367757, at *2 (Del. Super. Jan 15, 2010) (remanding when the Board failed to make the necessary factual determinations regarding the timeliness of Claimant's appeal)).

[53] Id. (citing Toribio v. Peninsula United Methodist Homes, Inc., 2009 WL 153871, at *1 (Del. Super. Jan. 23, 2009) (citing Connections Cmty. Support Programs, Inc. v. Bantum, 2001 WL 1628474, at *2 (Del. Super. Mar. 30, 2001)).

Commission's findings must be supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[54] Based on the record and the plain language of the Commission, it is difficult for this Court to ascertain how, why, and in what manner the Commission reached its decision. The Commission proffers no insight into its decision-making process. Without this critical information, the Court cannot conclude that the Commission's determination was reasonably based on any evidence – and certainly not substantial evidence. The Commission's findings must clearly appear in the hearing record before this Court. They do not. Accordingly, the Commission's "findings" do not withstand appellate review and must be addressed on remand.

## C. **The Commission Makes No Findings of Law Subject to This Court's Review**

As outlined above, the Commission's inclusion of PPA and OPEB in rate base cannot stand because no evidentiary basis has been provided to support its inclusion. Without those findings and the reasoning upon which those findings are based, this Court cannot execute its statutorily mandated examination. Likewise, the Commission does not perform any legal analysis, interpret any applicable statutory provision, or reference any cognizable conclusion of law. This Court cannot

---

[54] Id. (citing Thompkins v. Reynolds Transp., 2021 WL 99729, at *3 (Del. Super. Jan. 11, 2021) (internal quotation marks omitted) (quoting Toribio, 2009 WL 153871, at *2)).

determine that an "error of law" has been made in a decision completely devoid of any reference to the law.

## Conclusion

The Commission's findings and reasoning must clearly appear to this Court. An administrative agency maintains an obligation to explain how its judgment is rendered. Without this explanation, this Court cannot evaluate the order and logic behind the deductive process. Accordingly, Order 9953 is reversed and remanded back to the Commission for further findings of fact and conclusions of law consistent with this opinion.

**IT IS SO ORDERED.**

_____
Reneta L. Green-Streett, Judge