**CHESAPEAKE UTILITIES CORPORATION, a Delaware Corporation, Appellant,**

v.

**DELAWARE PUBLIC SERVICE COMMISSION, Appellee.**

C.A. No. 96A–01–002–WTQ.

Superior Court of Delaware, Kent County.

Argued: March 7, 1997.
Decided: March 31, 1997.

William A. Denman, Schmittinger & Rodriguez, P.A., Dover, for Appellant Chesapeake Utility Corporation.

James McC. Geddes, and Regina A. Iorii, Ashby & Geddes, Wilmington, for Appellee Delaware Public Service Commission.

Patricia A. Stowell, Public Advocate, Wilmington, for the Office of the Public Advocate, a Party in Interest pursuant to 29 *Del. C.* § 8829(c).

QUILLEN, Judge.

## I. *INTRODUCTION*

Must the Delaware Public Service Commission allow a public natural gas utility company to recover, as a consequence of complying with federally-mandated environmental remediation, the entire cost of compliance, specifically including the carrying costs on the unamortized balance of the remediation expenditure recovery? This is the underlying question in issue on this appeal by

the Chesapeake Utilities Corporation ("Chesapeake" or "Company") following the findings and order of the Delaware Public Service Commission ("Commission" or "DPSC") below. The question arises in the context of the Commission's power to regulate the rates charged by Chesapeake. 26 *Del. C.* § 201.

## II. FACTUAL BACKGROUND

The Company is a previous owner of a site in Dover (the "Dover Site") upon which a manufactured gas plant ("MGP") once operated. From 1859 to 1948 this site was used by various owners to manufacture gas prior to the availability of propane and the existence of interstate pipelines. The Dover Gas Light Company ("Dover Gas") operated the MGP on the site from 1925 to 1948. In 1947, Chesapeake purchased all of the outstanding shares of common stock of Dover Gas and in the 1960's merged Dover Gas into Chesapeake. In 1949, the State of Delaware purchased the site from Dover Gas. Thus, Chesapeake has had no property interest in the site for almost one-half century, and it had such an interest for only two years in the 1940s.

In 1980, the United States Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 *U.S.C.* § 9601, *et seq.*, in an effort to clean up property and groundwater contaminated by the disposal of hazardous waste. CERCLA imposes joint and several liability for cleaning up contaminated sites (commonly known as "Superfund" sites) upon current and past owners or operators of the site from which there has been or there is a substantial threat of a release of a hazardous substance into the environment. The accompanying disposal of tars, oils and other by-products of the gas manufacturing process at the Dover Site resulted in contamination of the soil and the groundwater.

The contamination was first discovered in 1984. The remains of the coal gasification plant were found buried on the site, and oily samples were found containing significant contamination levels. The groundwater on

the site and southeast of the site was contaminated with several volatile organic compounds. In 1991, the Environmental Protection Agency ("EPA") designated the Dover Site as a Superfund site. Chesapeake, among others, has been identified as a potentially responsible party ("PRP") for the clean up expenses.[1]

In July of 1990, Chesapeake entered into an Administrative Consent Order with the EPA and the State of Delaware Department of Natural Resources and Environmental Control in which Chesapeake agreed to conduct a remedial investigation and feasibility study ("RI/FS") to determine the nature and extent of the contamination at the Site and to evaluate potential remedial options. The RI/FS was completed in June 1993, and the EPA issued a record of decision ("ROD") in August 1994. The ROD required Chesapeake, *inter alia*, to remove contaminated soil and other contaminant-source material from the Site, to install a line of recovery wells in the off-site groundwater plume to prevent continued migration of the contaminants, to install other wells within the groundwater plume to extract any concentration of contaminants, and to install wells for monitoring the progress of the groundwater cleanup.

Chesapeake, having already spent $2.7 million for on-site investigation costs, estimates the total present value of its future clean up costs to be $5.1 million: $3.3 million for soil remediation and $1.8 million for groundwater remediation. The costs, however, will not be incurred all at once. Expenditures for soil remediation are expected to be made over a two-year period, while expenditures for groundwater remediation could be made over a period as long as 30 years. On May 17, 1995, the EPA issued an order requiring the Company to implement the remedy established in the ROD. Implementation, however, has not yet begun as the Company and the other PRPs are currently negotiating with the EPA to reduce the level of remediation required. A favorable outcome for Chesapeake could lessen its ultimate total expendi-

---

1. Other PRPs include the State of Delaware, General Public Utilities, and Capitol Cleaners & Launderers, Inc.

tures. But expenses have been and currently are being incurred, so this opinion does have some urgency for the annual cycles of ratemaking.

## III. PROCEDURAL BACKGROUND

On April 4, 1995, seeking to recover its costs of complying with the environmental remediation order, Chesapeake filed with the Commission an application for an increase in Chesapeake's rates. The Commission determined on April 25, 1995, that the increase sought should be suspended pending the completion of evidentiary hearings conducted by a Hearing Examiner. On April 26, 1995, the Office of the Public Advocate moved to intervene in this matter pursuant to 29 Del. C. § 8829(c).

On August 31, 1995, during evidentiary hearings, the parties presented to the Hearing Examiner a stipulation and agreement that settled all of the contested issues except for the ratemaking treatment to be afforded certain environmental remediation costs. The Hearing Examiner approved the agreement and recommended acceptance to the Commission. The Commission did so in In re Chesapeake Util. Corp., Docket No. 95–73,

Order No. 4104 (Dec. 19, 1995) (hereinafter "Order No. 4104").

The issues litigated at the evidentiary hearing were the propriety of Chesapeake's claimed environmental remediation costs, the amount of such costs to be recovered, and how those costs should be recovered in rates. The costs claimed were those incurred and to be incurred in connection with Chesapeake's remediation activities at the Dover Site. Chesapeake sought to include these expenses over an extended period of time and recover carrying charges on the unamortized balance.[2]

The Hearing Examiner recommended to the Commission that the environmental expenses be collected through a rider [3] or surcharge to base rates. The Hearing Examiner also recommended that the Commission allow the Company to amortize its annual actual net environmental remediation expenses incurred in connection with the Dover Site over seven years, but recommended that the Company not recover any carrying costs on the unamortized balance.

The Commission accepted the Hearing Examiner's recommendation and allowed Chesapeake to recover the total annual "net

2. At various points throughout this opinion the Court will attempt to give some explanation of the terminology used, if only for the Court's own edification. Here, Chesapeake is projected to spend an additional $5 million (give or take) to clean up the Dover Site. Because Chesapeake seeks to recover the environmental expenses over an extended period of time, it will end up incurring the expenses prior to the time it recovers those expenditures from its ratepayers. For example, assume Chesapeake incurs $1 million in remediation expenses in Year One, but the amortization period for those expenses is five years. The *unamortized balance* is everything that is not recovered from (paid for by) ratepayers in the current year. In our example, the unamortized balance starts at 800,000 ($200,000 having been recovered that first year) and decreases by $200,-000 each year thereafter until a zero balance is achieved at the end of the five year period.

It is important to remember that Chesapeake incurs the expenses in Year One but does not completely recover them until Year Five. Chesapeake must therefore borrow money to cover those expenditures until it recovers the amortized amount each year. Like any borrower, Chesapeake has to pay for the privilege. The *carrying costs* on the unamortized balance are simply what it costs Chesapeake to borrow the money in Year One but not completely pay back

the lender until Year Five. In this respect the carrying costs are similar to the interest component on a mortgage. As additional remediation costs are incurred, the unamortized balance will correspondingly increase, and Chesapeake will have to pay additional carrying costs. In other words, the amount of the carrying costs, without accounting for a differential among the carrying costs expense periods, would be directly proportional to the size of the unamortized balance.

3. A *rider* evidently is a device commonly-used by utility commissions for dealing with environmental remediation expenses. The rider is the device by which the Company recovers its remediation expenses from the ratepayers. The rider allows for the recovery of the remediation expenses over a prolonged period of time, rather than impact ratepayers in a short one- or two-year period. The rider would be separate from the rate base (which itself is defined in Part V–A infra ), such separation allowing for flexibility because it could be reviewed on an annual basis and adjusted to reflect the Company's financial position. As counsel for the Commission stated at oral argument. a rider was considered because the Commission was concerned that the remediation expenses did not fit within any traditional category used in determining the rate base.

remediation costs" for the Dover Site. Agreeing with the Hearing Examiner, the Commission decided not to permit recovery of the environmental expenses through either operating expenses or the rate base approach, that is, traditional ratemaking.

> We agree with the Hearing Commissioner that it would not be appropriate to include in base rates the projected amounts of environmental expenses. This Commission has permitted expenses that will be incurred outside of the test period, or items that will be placed into service outside of the test period, to be included in operating expenses or rate base for the purpose of establishing rates when it is reasonably certain that the expense will be incurred or the item will be placed in service during the effective rate period *and* where the amounts associated therewith are sufficiently ascertainable.... The record demonstrates that the amounts Chesapeake has projected are not sufficiently known and measurable to be included in current rates, and, moreover, that it is likely that the full amount of those projected costs will not be incurred within the rate effective period.

Order No.4104, ¶¶ 99–100 at 44–45. Instead, the Commission decided to use a rider for recovery of the remediation costs.

> We further approve the Hearing Commissioner's recommendation that the Company's reasonable, actually-incurred remediation expenses should be recovered through a rider mechanism that is adjusted on an annual basis.... [I]t will advance administrative efficiency to collect these costs through a rider, as this will eliminate the need to adjust base rates when there is a change in the amount of remediation costs.

Order No. 4104, ¶ 103 at 44.

The Commission reduced the amortization period from seven to five years, allowed no rate base treatment of the unamortized balance, and reduced the unamortized balance by the associated deferred income taxes. Each year's expense will be placed in a separate pool and amortized over that five year period. Thus, the rider will change each year to account for the amortization of additional environmental expenses. In addition, the Commission's order also provided for review of the unamortized balance, and "appropriate remedial action" should the balance "threaten the Company's financial integrity." The Commission thus effectively denied the recovery of the carrying costs on the unamortized balance and allocated such expense as an unrecoverable risk of investment to be borne by the Company's stockholders.

The Company's appeal to this Court is limited to the issue of whether the Commission erred in denying recovery through expense treatment of the carrying costs or rate base treatment of the unamortized balance of actually-incurred remediation costs.[4] The use of the rider mechanism and the period of amortization for the remediation costs themselves are not in dispute on this appeal.[5]

### IV. STANDARD OF REVIEW

 On appeal from a decision from the Public Service Commission, this Court engages in a limited form of review.

(b) The appeal shall not be a trial de novo but shall be based upon the record before the Commission.

(c) The scope of review before the Court shall be that the Commission's findings shall be upheld if they are supported by sufficient evidence, free of error of law, and not arbitrary or capricious. When factual issues are reviewed the Court shall take due account of the presumption of official regularity and the quasi-legislative function and specialized competence of the Commission.

---

4. There appears to be two ways to handle this, either treating the carrying costs as an expense or putting the unamortized balance in the rate base. It has not always been clear to the Court what Chesapeake is seeking, but it will assume for purposes of this opinion that both were argued.

5. The Court sees some anomaly in Chesapeake's position. On the one hand, the Company agrees to the rider and the period of amortization for recovery of the remediation expenses themselves. But on the other hand, for the carrying costs, which derive from the rider and the period of amortization, the Company says direct expense recovery or indirect rate base treatment is legally required.

26 *Del. C.* § 510. This Court does not sit as a trier of fact with authority to weigh the evidence, determine credibility, or make factual findings and conclusions. *Eastern Shore Natural Gas Co. v. Delaware Pub. Serv. Comm'n,* Del.Super., 635 A.2d 1273, 1277 (1993), *aff'd,* Del.Supr., 637 A.2d 10 (1994) (hereinafter *"Eastern Shore"*). Substantial weight should be given to the Commission's interpretation of a statute it is empowered to enforce, provided that construction is not clearly erroneous. *Vassallo v. Haber Elec. Co.,* Del.Super., 435 A.2d 1046, 1050 (1981). The Court's role is to determine whether substantial evidence exists on the record to support the Commission's factual findings and to correct errors of law. *Eastern Shore,* 635 A.2d at 1277; *General Motors v. Freeman,* Del.Supr., 164 A.2d 686, 688 (1960); *Johnson v. Chrysler Corp.,* Del.Supr., 213 A.2d 64, 66–67 (1965). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Oceanport Indus. v. Wilmington Stevedores, Inc.,* Del.Supr., 636 A.2d 892, 899 (1994). Finding substantial evidence on the record to support the Commission's decision and no errors of law, the Court affirms.

## V. DISCUSSION

 The Commission's authority over public utilities is found in the Public Utilities Act of 1974 ("the Act"), 26 *Del. C.* § 101, *et seq.* The Commission has the dual duties of ensuring that the cost of service to utility customers is reasonable and ensuring a fair return to the utilities' investors. *In re Diamond State Tel. Co.,* Del.Supr., 113 A.2d 437, 441 (1955). In exercising its powers and discharging its duties, the Commission must also consider the interests of the utility's consumers. 26 *Del. C.* § 201. Ratemaking is commonly considered an art, not a science.

### A. Commission Ratemaking and Rate Base Determinations

 The Commission's general powers include the power to regulate the rates charged by utilities. 26 *Del. C.* § 201. The

utility seeking the rate increase has the burden of proving that its proposed rates are just and reasonable. 26 *Del. C.* § 307(a). The primary purpose of ratemaking is to fix rates sufficient to give the utility a fair return upon the present value of property dedicated to the public use. *Public Serv. Comm'n v. Wilmington Suburban Water Corp.,* Del.Supr., 467 A.2d 446, 447 (1983) (hereinafter *"Wilmington Suburban"*). The Commission employs a basic four question analysis in setting rates, which has been recognized by the Delaware Supreme Court.

> [R]ate determinations involve four basic inquiries, expressed concisely in the formula $R = E + (V \times r)$. Defining the four variables,
>
> R equals the utility's gross revenues under the rate structure examined.
>
> E equals the *operating expenses* including maintenance, depreciation, and all taxes incurred to produce R.
>
> V equals the value of the utility's property which provides the services for which rates are charged, *i.e., the rate base.*[6]
>
> r equals the rate of return, expressed as a percentage, which should be applied to the rate base to establish the return to which the investors in the utility enterprise are reasonably entitled.

*Id.* at 448 n. 2 (emphasis added). This formula, although not mandated by statute, succinctly explains the ratemaking approach used by most utility commissions. *See, e.g., In re Richards,* 134 N.H. 148, 590 A.2d 586, 593, *cert. denied,* 502 U.S. 899, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); *Turpen v. Oklahoma Corp. Comm'n,* Okla.Supr., 769 P.2d 1309, 1316 n. 7 (1988); *New England Tel. & Tel. Co. v. Public Util. Comm'n,* Me.Supr., 390 A.2d 8, 14 (1978); *South Hinds Water Co. v. Mississippi Public Serv. Comm'n,* Miss.Supr., 422 So.2d 275, 281 (1982); 64 Am.Jur. 2d *Public Utilities* § 135. Note that the formula plainly indicates that operating expenses ("E") are not part of the rate base

---

6. Delaware law explicitly sets out what is includable in the rate base. *See* this part, *infra,* and 26 *Del. C.* § 102(3). Moreover, the statute clearly indicates that determination of the rate base may be a necessary step for the Commission to undertake in the performance of its duties under the statute *See* 26 *Del. C.* § 302, quoted *infra.*

("V"), but, rather, such expenses are included in the overall calculation of the rate.

In addition to setting the rates, the Commission also has the authority to determine a utility's rate base.

> The Commission may, from time to time, ascertain and determine the rate base of any public utility whenever, in the judgment of the Commission, it is necessary to do so for the purposes of carrying out this chapter, and in making such determination the Commission may have access to and use any books, documents, or records in the possession of any department, board, commission or agency of this State or any political subdivision thereof In ascertaining and determining the rate base, the Commission may determine every fact, matter, or thing which, in its judgment, does or may have any bearing thereon.

26 *Del. C.* § 302. On its face, § 302 gives the Commission some discretion to determine when an adjustment to the rate base is necessary. The permissive language would suggest a wide discretion to decide how rate base is factored into the ultimate determination of a just and reasonable rate. *See* 26 *Del. C.* §§ 307(a), 309(a), 311. But, under the gloss applied by our Supreme Court, the Commission has no power to defer an approved return on a recognized component of a utility's rate base, on the Supreme Court's theory that such a deferral would be tantamount to a denial of a fair rate of return and impermissible if it substantially reduces revenues. *Public Serv. Comm'n v. Diamond State Tel. Co.*, Del.Supr., 468 A.2d 1285, 1293 (1983). Section 102(3) of Title 26 defines the rate base:

> (3) "Rate base" means:
>
> a. The original cost of all used and useful utility plant and intangible assets either to the first person who committed said plant or assets to public use or, at the option of the Commission, the first recorded book cost of said plant or assets; less
>
> b. Related accumulated depreciation and amortization; less
>
> c. The actual amount received and unrefunded as customer advances or contributions in aid of construction of utility plant, and less

> d. Any accumulated deferred and unamortized income taxes and investment credits related to plant included in paragraph a. above, plus
>
> e. Accumulated depreciation of customer advances and contributions in aid of construction related to plant included in paragraph a. above, and plus
>
> f. Materials and supplies necessary to the conduct of the business and investor supplied cash working capital, and plus
>
> g. Any other element of property which, in the judgment of the Commission, is necessary to the effective operation of the utility.

The rate base is "the dollar value of the utility's plant employed in providing its service to the public and upon which the utility and its investors are entitled to earn a fair return. The rate base is, in effect, the investment upon which the investors' return is earned." *Wilmington Suburban*, 467 A.2d at 448. *See also* 64 AM.JUR. 2d *Public Utilities* § 138. The Commission's decisions as to valuation involve complex and difficult economic judgments and are to be given considerable weight. *In re Delmarva Power & Light Co.*, Del.Super., 337 A.2d 517, 519 (1975).

### B. The Commission did not Commit Legal Error in Finding that these Remediation Costs were an Extraordinary Expense

Whether the remediation costs, including the carrying costs on the unamortized balance, are operating or extraordinary expenses is important in determining whether the Commission is required to allow Chesapeake to recover the carrying costs, and this is the first issue that must be resolved on Chesapeake's appeal. Under Delaware law, a utility is entitled to recover all operating expenses it legitimately incurs unless those operating expenses are the result of waste, inefficiency, or bad faith. *Delmarva Power & Light Co. v. Public Serv. Comm'n*, Del. Supr., 508 A.2d 849, 859 (1986). Therefore, if these remediation costs are operating expenses (the "E" component in the formula), Chesapeake should have been allowed to re-

cover all the associated expenses, including the carrying costs, in the absence of waste, inefficiency, or bad faith.

On the other hand, Delaware law has not previously guaranteed a utility the right to recover all of its extraordinary expenditures. The reason for this is that extraordinary expenditures do not fit neatly within the Commission's ratemaking calculus. They are not operating expenses because they do not arise in the day to day operation of the business. And they are only included in the rate base if, in fact, they are a "recognized component" of the rate base and therefore mandated by law, see *Diamond State Tel. Co.*, 468 A.2d at 1291–93, or if the Commission decides to exercise its discretion upon a finding that the utility's effective operation would be impaired by a denial of the extraordinary expense. *See* 26 *Del. C.* § 102(3). Generally, however, the Commission has chosen to exercise that discretion so as to exclude the extraordinary expense from the rate base and instead use the rider mechanism previously discussed. To a nonaccountant layman, extending the recovery period is a change to make the extraordinary more ordinary, similar to a mortgage to take care of a 20–year flood. Part of the reason for so doing appears to be the need for regularity and predictability in measuring a utility's operating expenses and rate base for ratemaking purposes. The substantial size of these expenses, the total of which Chesapeake did not demonstrate to the Commission's satisfaction, apparently would skew those measurements.

In the proceeding below, the Commission determined that the remediation expenses, including the unamortized balance, are extraordinary expenses.

> [T]hese are not ordinary operating expenses, such as salaries and wages, that the Company uses for its day to day op-

erations; that is, they are not recurring expenses in the utility's day to day operations. They are, rather, extraordinary expenses, thrust upon the Company by a change in the law that created liability where there previously had been none, and thus are more properly deemed unexpected.

Order No. 4104, ¶ 105 at 45. The Commission argues that it has, in the past, never treated remediation costs as operating expenses because, at least in part, they were not inherent in the cost of producing the service. Chesapeake itself recognized the extraordinary nature of these expenses when it stated in its opening brief to the Hearing Commissioner that the remediation expenses involved here are "sufficiently extraordinary as to warrant special rate making treatment." See Appellee DPSC App. at 47. In its reply brief to this Court, however, Chesapeake argues that "[e]nvironmental expenses relating to MGP sites, in today's environmental climate, do represent a normally recurring expense of a natural gas utility.... These environmental expenses are not unique to Chesapeake.... Expenses that have been incurred for 12 years and will continue for 30 years must surely be considered recurring." *See* Appellant's Reply Br. at 7.[7]

The problem with Chesapeake's position is that it is not consistent with the position it took before the Commission below. This Court engages in an appellate review on the record. In other words, an issue not raised before the Commission should *not* be raised for the first time on appeal. Since Chesapeake admitted before the Hearing Commissioner that the remediation costs are "sufficiently extraordinary as to warrant special ratemaking treatment," the Court should not now accept Chesapeake's new argument that these costs are recurring operating expenses.

---

7. The Court confesses its own anxiety with regard to these expenses. CERCLA and its state counterparts have the salutary effect of repairing damage done to our environment, but they are probably the most tyrannical laws imposing civil liability ever enacted in this country, imposing, as they do, retroactive strict liability. The amounts are almost always staggering for the entity involved, the frequency of imposition

seems only limited by the frequency of investigation, with every gas station a seemingly sure target; and the administrators of the law seem at times totally oblivious to any reasonable appreciation of elementary land-owning economics. But the law has become part of our daily lives, and in this sense the awesome power of its enforcement, while haphazard, *collectively* is no longer out of the ordinary.

Even were the Court to examine the argument, Chesapeake seeks the impossible. As indicated above in Part V–A, operating expenses, contrary to Chesapeake's assertions, simply are not given rate base treatment. The Court cannot call the remediation costs "operating expenses" and at the same time give them rate base treatment, because operating expenses generally (1) are recovered completely when incurred, rather than amortized, and (2) are not something, like plant assets, upon which a utility earns a rate of return. Moreover, Chesapeake has agreed to and does not appeal the Commission's decision to use a rider mechanism for the primary recovery of an extraordinary expense, which is outside of the "traditional" ratemaking calculus, but its new argument on the recurring nature of the expenses implicitly does exactly that, whether it is a request for operating-expense treatment of the carrying costs or rate base treatment of the unamortized balance.

In any event, even were the Court to reach the issue Chesapeake presents here, the Court concludes, notwithstanding its own reservations as expressed in footnote 7, *supra*, that the Commission committed no reversible error of law in finding that these costs were extraordinary expenses, and that such a finding was supported by substantial evidence. Operating expenses are generally defined as those expenses inherent in the cost of producing the utility's service, required to keep the utility running. In other words, they are the expenses normally incurred in the course of the utility's ordinary activities. *See Lindheimer v. Illinois Bell Tel. Co.*, 292 U.S. 151, 167, 54 S.Ct. 658, 664, 78 L.Ed. 1182 (1934); 64 AM.JUR. 2d *Public Utilities* §§ 173–89; BLACK'S LAW DICTIONARY at 1091 (6th ed.1990). This may include such items as maintenance and repair, payroll, insurance premiums. taxes paid, legal expenses, collection costs, and advertising fees. *See* 64 AM.JUR. 2d *Public Utilities* §§ 173–89. Extraordinary expenses, on the other hand, are generally defined as "[a]n expense characterized by its unusual nature and infrequency of occurrence; *e.g.* plant abandonment, goodwill write-off, large product liability judgment." BLACK'S LAW DICTIONARY at 587 (6th ed.1990).

Based on these general definitions, the Court finds that the Commission's decision that the environmental remediation costs incurred and to be incurred. by Chesapeake are extraordinary expenses is supported by substantial evidence. The event which occasioned these expenses, the imposition of liability under CERCLA, is not itself a recurring event, regardless of the fact that costs related to complying with orders issued under CERCLA may be paid out over several years.[8] While it is not uncommon for utility companies, particularly gas utilities, to be held liable for such cleanups, this realization does not alter the fact that such liability probably is unusual and infrequent (or nonrecurring) with respect to the individual utility. The utility cannot predict with any accuracy for the future how often it will be found liable for environmental remediation, or whether it will be found liable at all. These considerations demonstrate that imposition of liability by federal law is suddenly creating costs for companies where such costs did not previously exist.

In the Court's opinion, Chesapeake's argument that the remediation costs are operating expenses is inconsistent with its position below. Even reaching the issue, the Commission's decision that the remediation expenses and all related costs are extraordinary expenses is supported by substantial evidence and free of legal error, and must therefore be affirmed.

### C The Analogy to Cash Working Capital is not Persuasive

Chesapeake also argues, notwithstanding the apparent separation of operating expenses and rate base in the ratemaking formula, that an operating expense can also be part of the rate base because to find other-

---

8. The duration of estimated expenditures for the soil remediation, which comprise about 65% of the estimated costs, is only 2 years. In other words, only about 35% of the total estimated expenditures are to be incurred over the 30–year period stated by Chesapeake, presumably most of it for the long-term groundwater remediation.

wise "ignores the concept of working capital." [9] As argued by Chesapeake, cash working capital is an operating expense and is normally included in the rate base. Citing to Delaware law holding that a company is normally entitled to "recognition and allowance" for cash working capital,[10] Chesapeake argues that the carrying costs on the unamortized balance of the remediation expenses are analogous to the carrying charges on cash working capital because, much like working capital, amortization of the remediation expenses creates a time lag between the time that the Company incurs the expense and the time it recovers that expense from the ratepayers. From that premise, Chesapeake concludes that the statement that operating expenses are not includable in the rate base must necessarily be false, and that the similarity between cash working capital and the unamortized balance warrants similar rate base treatment to cover the carrying costs.

Chesapeake's arguments are unpersuasive. First, in none of the decisions cited by Chesapeake is there anything to support Chesapeake's bald and erroneous assertion that cash working capital is an operating expense. *See In re Diamond State Tel. Co.*, 149 A.2d at 328; *In re Wilmington Suburban Water Corp.*, 367 A.2d at 1344. Rather, cash working capital, like fixed assets, represents "invested capital." *See* Casenote, *Cash Working Capital as an Element of the Telephone Rate Base*, 52 Colum. L.Rev. 673 (1953), *cited on other grounds in In re Diamond State Tel. Co.*, 149 A.2d at 328. It is upon that invested capital that the investors who supplied it are entitled to earn a return. *Id.* As such, it is property includable in the rate base as an asset of the company, not an operating expense such as payroll, maintenance, or repair. This is reflected in 26 *Del. C.* § 102(3)f, which expressly includes

"investor supplied cash working capital" as a component of the rate base. The unamortized balance of the remediation expenses is not invested capital; it represents expenses already paid for environmental cleanup, not cash on hand for paying operating expenses as they arise.

Second, an additional distinction between the carrying charges on cash working capital and the carrying costs on the unamortized balance of the remediation expenses is that working capital exists for the payment of operating expenses, not extraordinary expenses. *See Alabama–Tenn. Nat. Gas. Co. v. Federal Power Comm'n*, 3d Cir., 203 F.2d 494, 498 (1953); 52 Colum. L.Rev. 673–74 (1953). As noted, the general purpose of cash working capital is to enable a company to plan, in advance, how to meet its obligations with respect to expenses that typically arise in the day-to-day operation of the business. Extraordinary expenses are by their very nature not expenses that typically arise in day-to-day operations. Since the Court has already affirmed the Commission's finding that the remediation costs are extraordinary expenses, the analogy to cash working capital is particularly unpersuasive.

## D. An "Original Cost" of a "Used and Useful Utility Plant or Intangible Asset" has not been Incurred

The language of 26 *Del. C.* §§ 102(3)a.[11] affords the Commission no discretion to deny rate base treatment of the unamortized balance if it meets that paragraph's provisions. Equity and fair play, however, were at the heart of the Commission's order, both on the appealed and the non-appealed issues. In deciding that the net remediation costs are recoverable through a rider, the Commission's order cited to notions of equity and fair

---

9. *Cash working capital* is "an allowance for the sum which the company needs to supply from its own funds for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently.... [T]he need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred." *In re Diamond State Tel. Co.*, 149 A.2d at 327.

10. *In re Wilmington Suburban Water Corp.*, Del.Super., 367 A.2d 1338, 1344 (1976).

11. Paragraphs b. through f. are inapplicable on their face; b. through d. address subtractions to the rate base, not additions, and the unamortized balance of environmental remediation costs plainly do not fit within either e. or f., nor has Chesapeake argued otherwise, except in its cash working capital analogy.

play, not to any definition of rate base, "We believe it would be unfair to hold the Company liable for lacking the clairvoyance to foresee the passage of CERCLA." Order No. 4104, ¶ 102 at 44. The Commission's order with regard to the appealed issue, the carrying costs on the unamortized balance, discusses the same notions of what is equitable and fair in deciding to allocate the carrying costs to the stockholders of Chesapeake. *Id.,* ¶ 108 at 46.

The Court's task here on appeal is to determine whether the unamortized balance fits within § 102(3)a. In the Court's view, it does not; therefore, the Commission's exercise of discretion was not legal error. Rather, inclusion of the unamortized balance of the environmental remediation expenses in the rate base was a matter within the discretion of the Commission under § 102(3)g.

As noted above, § 102(3)a. defines the "rate base" as "[t]he original cost of all used and useful utility plant and intangible assets either to the first person who committed said plant or assets to public use or, at the option of the Commission, the first recorded book cost of said plant or assets." It requires the Court to answer three questions: (1) is the underlying item for which the expense was incurred a "utility plant" or "intangible asset?"; (2) if so, is the utility plant or .intangible asset "used and useful?"; and (3) if so, is the expense sought to be recovered the "original cost" of the used and useful utility plant or intangible asset?

In the proceeding below, the Commission found that § 102(3)a. was inapplicable because the land to which the remediation costs related was no longer "used and useful" in the provision of utility services to Chesapeake's customers. Before this Court, the Commission argues that the Dover Site is completely unrelated to the provision of services to Chesapeake's customers, and therefore has no applicable usefulness or utility of which to speak. Consequently, the Commission concludes, the remediation costs are not within § 102(3)a. Chesapeake takes exception to this analysis and argues that the unamortized balance is properly within § 102(3)a. because these remediation expenses are a "used and useful expenditure."

Specifically, in its reply brief Chesapeake asserts that § 102(3)a. applies not because the property is a used and useful utility plant, but because the unamortized balance is an intangible asset.

There appears to be no pertinent case law in Delaware expressly defining "utility plant" or "intangible asset" within the context of § 102(3)a. of the Public Utilities Act. However, a review of the Public Utilities Act and general authorities indicates that "utility plant" is the physical objects and structures comprising a utility's operations and which it uses to provide service to its customers. A utility's "plant" is, essentially, the tangible property it devotes to the public service. *See Wilmington Suburban,* 467 A.2d at 448, 64 Am.Jur. 2d *Public Utilities* § 138. A similar review indicates that an "intangible asset" is property that is a "right," such as a trademark, lease, or patent, or which lacks a physical existence, such as goodwill or going concern value. It is a non-physical, non-current asset which exists only in connection with something else, such as the goodwill of a business. See 64 Am. Jur. 2d *Public Utilities* §§ 165–72; Black's Law Dictionary at 808–09 (6th ed.1990).

The unamortized balance of the remediation costs clearly is not utility plant, since it has none of those features generally associated with a utility plant. Furthermore, the Court is also not inclined to reach the question of whether the unamortized balance is an intangible asset includable in the rate base under § 102(3)a. Chesapeake made this argument for the first time in its reply brief It did not argue this below, either before the Hearing Commissioner or the Commission, nor did it assert the argument to the Court in its opening brief In fact, in the proceeding below Chesapeake acknowledged that the unamortized balance did not fit neatly into any definition of "rate base" as defined in § 102(3), and such acknowledgment on the part of all the parties involved appears to have been one of the reasons for using the rider. Although Chesapeake seems to have changed its mind on appeal, the Court believes its earlier statement was the correct one. Indeed, there is something to be said for following the traditional rules of appellate

practice, that is, only arguing on appeal that which was raised below. What Chesapeake has effectively done is sandbag the Commission with regard to its contention as to the unamortized balance as an intangible asset.

■ Even were the Court to address this issue, the Court does not find that Chesapeake is correct. The unamortized balance is not an intangible asset within the meaning of § 102(3)a. Environmental cleanup expenses are not the type of expense that must be capitalized. *See, e.g., Dewing v. Western Smelting & Metals, Inc.,* 135 Or. App. 397, 898 P.2d 224, 228, *review denied,* 322 Or. 167, 903 P.2d 885 (1995) (denying capitalization of environmental cleanup costs). Admittedly, there is some confusion within the Internal Revenue Service as to the proper tax treatment for such costs, that is, whether such costs should be deducted as a business expense (via I.R.C. § 162) or capitalized (via I.R.C. § 263). *See* Steven G. Black, *The Continuing Saga of Environmental Cleanup Costs,* 1995 B.Y.U.L. REV. 1321; Larry Winter & Michael Lynch, *Tax Consequences of Environmental Cleanup Costs,* 23 REAL EST. L.J. 268 (1995); Mary Lou Hopun, *To Expense or to Capitalize? The Impact of Federal Income Tax Treatment of Environmental Cleanup Costs Under CERCLA,* 19 DAYTON L.REV. 679 (Winter 1994). But clearly such recently-created and unusual expenses under our regulatory law are not mandated to be capitalized by the Commission unless the law expressly states or necessarily implies it. The phrase "intangible asset" alone simply does not require this capitalization.

Additionally, the purpose of § 102(3)a. is to permit a utility to earn a return on investments that are used and useful in providing utility services, whether those investments result in tangible utility plant, like inside wiring, or an intangible asset, like a patent. Delaware case law defines the rate base, in part, as the value of the utility plant used by the utility i providing service to the public, or "the *investment* upon which the investors' return is earned." *Wilmington Suburban,* 467 A.2d at 448. The Court cannot find that the mandated unamortized balance of remediation cleanup costs can really be said to be

an investment in any normal sense of the word. Investment, very generally, is "the placing of capital or laying out of money in a way intended to secure income or profit from its employment." BLACK'S LAW DICTIONARY at 825 (6th ed.1990). The environmental remediation expenses, to which the unamortized balance is but a part, are not intended to secure income or profit, unlike a patent or contract right. They are simply already-incurred extraordinary expenses "intended" to remedy past environmental degradation. The Court has a hard time viewing already-incurred remediation costs as an investment or an intangible asset.

■ Moreover, the Court affirms the implicit finding of the Commission that, even if the unamortized balance is an intangible asset within the meaning of § 102(3)a., it is not a used and useful asset. It would make no sense to apply that statutory refinement to utility plant and not apply it to intangible assets, a more nebulous classification of property which needs a firmer nexus to the rate base. As the Supreme Court has noted, the used and useful standard requires that the utility plant or intangible asset "be reasonably necessary to the efficient and reliable provision of utility service to the public." *Diamond State Tel. Co.,* 468 A.2d at 1290. The unamortized balance is not such an asset. The original cost of a "used and useful" intangible asset has not been incurred.

### E. The Commission's Exercise of Discretion is Free of Legal Error and Supported by Substantial Evidence

■ It is important to note that the concepts of equity and fair play which appear to rankle Chesapeake are quite relevant to § 102(3)g. The clear language of the paragraph affords the Commission the kind of equitable power which it used to deny the carrying costs. *See* 26 *Del. C.* § 102(3)g. ("Any other element of property which, in the judgment of the Commission, is necessary to the effective operation of the utility"). This grant of discretion is consistent with the "equity" and "fairness" language present throughout the Act. *See, e.g.,* 26 *Del. C.* § 115 ("in the interests of the people of this State and the public utilities as well"); § 201 ("the

Commission shall consider the interests of subscribers ... as well as the interests of the consumer"); § 302 ("in the judgment of the Commission"); § 310 ("if the public interest so requires"); § 311 ("the Commission shall determine the just and reasonable rate"). The Commission consequently committed no error of law in using discretion, and the Court's only inquiry is whether its decision to exercise discretion so as to exclude recovery of the carrying costs by denying rate base treatment of the unamortized balance is supported by substantial evidence. The Court finds that substantial evidence exists and that the Commission's decision and exercise of discretion should be affirmed, for five reasons: (1) Chesapeake fails to show that its "effective operation" will be impaired; (2) existing decisions from other jurisdictions are distinguishable and conflicting; (3) the Commission's decision is consistent with its own precedent; (4) the Court must and will defer to the Commission's expertise in these matters, rather than substitute its own considerably less-informed judgment; and (5) the Commission's Order is flexible.

### 1. Chesapeake fails to show that its "effective operation" will be impaired

The Commission made a number of findings in its conclusion that recovery of the carrying costs of unamortized balance was not necessary to the "effective operation of the utility" under § 102(3)g. First, there are uncertainties regarding the exact amount of the remediation costs. Chesapeake admits that its *projected* figure of $5.1 million could be significantly lower once cleanup begins. There are additional PRPs, including the State, which have yet to have their liability determined. If any or all of the PRPs reach a settlement with the EPA, Chesapeake's own share of the liability costs will likely be reduced. Second, there is a lack of strong or conclusive evidence that denying recovery of

the carrying costs would threaten the Company's "effective operation," to use the statutory language found in § 102(3)g. Chesapeake's reply brief only shows that *if* its projections as to costs are correct, the denial of carrying costs *might* have "a significant financial impact" upon the Company. It does not state, let alone show that this "significant financial impact" would actually threaten its "financial integrity" and impede its "effective operation." [12] Nor does it provide any evidence to back up its assertion that it would have difficulty obtaining debt or equity financing for the remediation costs without recovery of the carrying costs. In short, Chesapeake has not provided either the Commission or the Court with any hard data to support its claim that its effective operation will be impaired.

### 2. Existing decisions from other jurisdictions are distinguishable and conflicting

The Court has thus far avoided discussion of the case law from other jurisdictions upon which both parties relied in their briefs. Given the importance which the parties attached to those cases, it seems proper to explain why those decisions ultimately are unpersuasive. The Company relies heavily upon the Illinois Supreme Court's decision in *Citizens Util. Bd. v. Illinois Commerce Comm'n*, 166 Ill.2d 111, 209 Ill.Dec. 641, 651 N.E.2d 1089 (1995). The facts of that case are somewhat similar to the instant case. There, a utility had been permitted the rate base recovery of environmental remediation costs due to liability imposed under CERCLA. As in the case at hand, the Illinois utility was liable for cleanup expenses from previously-owned manufactured gas plant sites. The reviewing commission ordered the utilities to amortize the cleanup costs over five years, but did not allow recovery of the carrying charges on the unamortized por-

---

**12.** The Court is uncertain of the origins of the Commission's equating of "financial integrity" with "effective operation." To this Court, a "financial integrity" standard could suggest a situation where the utility is "going under" and removes a great deal of the flexibility promised by use of the rider That the Commission might hold the utility to such a drastic requirement before

allowing a revision of the rider or other relief seems more than a trifle unfair, and perhaps unlawful as a denial of a "fair" rate of return. If this is indeed the intended standard to be employed at some future time, the Commission, in this Court's judgment, would do well to reexamine it.

tion of the costs. *Id.* 209 Ill.Dec. at 646, 651 N.E.2d at 1094. The appellate court affirmed the commission's order. *Central Ill. Light Co. v. Illinois Commerce Comm'n,* 255 Ill.App.3d 876, 193 Ill.Dec. 418, 626 N.E.2d 728 (1993). The Illinois Supreme Court reversed and granted the utility rate base treatment of the unamortized balance.

The Illinois Supreme Court rejected the Illinois commission's claim that the remediation costs were not recoverable because they are unrelated to providing current service. "The cost of delivering utility service reasonably encompasses current costs of doing business, including necessary costs of complying with legally mandated environmental remediation." *Citizens Util. Bd,* 209 Ill.Dec. at 648, 651 N.E.2d at 1096. The Illinois Court rejected a "sharing" of the total remediation costs between the ratepayer and the stockholders. "Amortization of the cleanup costs, coupled with denial of interest charges on the unamortized balance amounts to a discounting. The result is a less than full recovery of the coal-tar cleanup expenses for the utilities." *Id.*

Chesapeake argues that this case is indistinguishable from the Illinois decision and that a similar result should follow. However, the *Citizens Utility Board* case is distinguishable on three grounds. First, the Illinois high court treated the remediation expenses as operating rather than extraordinary expenses. *Id.* 209 Ill.Dec. at 650, 651 N.E.2d at 1098. This Court has already affirmed the Commission's decision that the remediation costs are not operating expenses, so the applicability of the *Citizens Utility Board* Court's analysis to this case is questionable. Second, the Illinois commission's decision was a "departure from [its] traditional treatment of operating expenses by distinguishing the coal-tar cleanup costs from those costs that are completely recoverable." *Id.* In other words, it broke with its own precedent in reaching this decision without explaining why. As the Court will explain in the next section, our Commission did not break with its own precedent.

Third, the *Citizens Utility Board* Court found that a denial of carrying costs was inconsistent with prefatory language in the Illinois Public Utilities Act which allows utilities to recover the total costs they prudently and reasonably incur. *Id.* 209 Ill.Dec. at 651, 651 N.E.2d at 1099. The Illinois Supreme Court sort of contradicted itself here, because in so ruling it criticized the Illinois commission for relying on prefatory language in the Illinois Act which stated that the commission should use equity for the fair treatment of consumers and investors *Id.* 209 Ill.Dec. at 650–51, 651 N.E.2d at 1098–99. Also, the Court does not know if that prefatory language in the Illinois Public Utilities Act is intended to cover both extraordinary and operating expenses so it is unclear whether this would have made a difference to the Illinois court had it determined the expenses were extraordinary. Most importantly for purposes of this Court's decision, though, there is no prefatory language in the Delaware Public Utilities Act comparable to that in the Illinois Public Utilities Act which would require or even suggest recovery of *all* expenses, operating and extraordinary. For all of these reasons this Court finds *Citizens Utility Board* to be an informative but distinguishable case.

Another decision upon which Chesapeake relied heavily was a decision by the Maryland Public Service Commission in *In re Chesapeake Util. Corp. (Citizens & Cambridge Divs.),* Md. Public Serv. Comm'n, Case No. 8157, Order No. 68462 (June 9, 1989), *aff'd,* Md. Cir. Ct., Case No. 3333 (May 16, 1990). In that order, the Maryland commission permitted Chesapeake to include the unamortized balance in its rate base, and Chesapeake argues that this decision is persuasive. Like the *Citizens Utility Board* decision, however, there are critical differences. The Maryland commission repeatedly emphasized that its decision was premised on the fact that the property subject to the environmental remediation was still used and useful in providing utility service to ratepayers.

> In explaining our decision, it is important to emphasize that the coal tar problem has occurred on land which is part of the Citizen's Gas Division's distribution facility in Salisbury. The property ... serves as a gas distribution center for the customers

in Salisbury. Thus, the property ... is currently used and useful to ratepayers. Without dispute from any party, the property is included in the Company's rate base.

*In re Chesapeake Util. Corp.*, Case No. 8157, Order No. 68462 at 6. Not even Chesapeake disputes that the Dover Gas Light Site is no longer "used and useful" in the provision of services to any of Chesapeake's customers. In the Maryland case, the land was still used for Chesapeake to provide services, albeit of a different sort, to its customers. Since this was a critical factor in that case, a factor which is missing in the present case, the Maryland court's decision is not sufficiently similar to be persuasive.

Finally, both sides cite to additional cases or dockets in other jurisdictions in which the full costs of remediation, including carrying costs, were granted to the utility, sometimes through general rates (expenses) and other times through rate base,[13] in which the full costs, like here, were split between the ratepayers and stockholders,[14] and in which recovery of remediation costs was denied entirely.[15] Also, in some of these cases and dockets the remediation expenses were deemed operating expenses, while at least two of them found the costs to be extraordinary. It would not be productive to dive into the minutiae of each case, since each occurrence has its own unique flavor, as one can already see from the Illinois and Maryland decisions. The Office of the Public Advocate has succinctly explained that uniqueness:

[E]ach instance of site remediation is unique in terms of the time period over

which the contamination occurred; the ownership of the site during that period; the time frame over which the utility owned the site; whether or not the site was ever in the rate base; whether or not the activities which gave rise to the contamination were regulated; the extent to which other parties may be liable; and the degree to which imprudent actions may have contributed to the contamination.

Office of the Public Advocate's Answering Br. at 14.

As the foregoing discussion indicates, there is no general agreement among authorities that the carrying costs on the unamortized balance of remediation expenditures are entitled to rate base treatment, nor is there unanimity on their characterization as operating or extraordinary expenses. Since each case is applying fairly unique facts under a different state's law, their usefulness is severely constrained in a case dealing with the Delaware division of a utility under Delaware's Public Service Utility Act.

### 3. The Commission's decision is consistent with its own precedent

 Another important reason for sustaining the Commission's decision is that the decision is consistent with its prior ratemaking decisions. Under Delaware law, an agency or commission is not forever bound by its prior determinations, but it must reasonably explain the reasons for adopting its new policy. *Eastern Shore Natural Gas Co. v. Delaware Public Serv. Comm'n*, Del.Supr., 637 A.2d 10, 18 (1994). It stands to reason

---

13. *See, e.g., In re Interstate Power Co.*, Minn.App., 559 N.W.2d 130, 134 (1997); *In re Green Mountain Power Corp.*, Vt. Public Serv. Bd., Docket No. 5695, 153 P.U.R. 4th 232, 1994 WL 275138 (May 13, 1994); *In re Public Service Elec. & Gas Co.*, N.J. Bd. of Regulatory Comm'rs, BRC Docket No. ER91111698J, 1993 WL 557635 (Sept. 15, 1993) at 14–17; *In re Yankee Serv. & Gas Co.*, Conn. Dept. of Public Util. Control, Docket No. 92–02–19, 1992 WL 333210 (Aug. 26, 1992) at *14.

14. *See, e.g., In re Consumers Power Co.*, Mich. Public Serv. Comm'n, 167 P.U.R. 4th 461, 1996 WL 144090, 1996 Mich. PUC LEXIS 69 (Mar. 11, 1996) at * 67; *In re Wisconsin Fuel & Light Co.*, Wisc. Public Serv Comm'n., 1995 WL 769988,

1995 Wisc. PUC LEXIS 43 (Oct. 10, 1995) at * 24; *In re Public Serv. Co. of North Carolina*, N.C. Util. Comm'n, 156 P.U.R. 4th 384, 402–03, 1994 WL 672616 (Oct. 7, 1994); *In re Kansas Public Serv.*, Kan. State Corp. Comm'n, 146 P.U.R. 4th 123, 124–25 (July 21, 1993). Interestingly, in some of these decisions, the split was done on the purely equitable "sharing" approach which Chesapeake. citing to *Citizens Utility Board*, says is so plainly contrary to the law.

15. *See, e.g., In re Indiana Gas Co., Inc.*, Ind. Util. Regulatory Comm'n, 162 P.U.R. 4th 283, 313, 1995 WL 447073 (May 3, 1995), *aff'd, Indiana Gas Co., Inc. v. Office of Util. Consumer Counselor*, Ind. Ct.App., 675 N.E.2d 739 (1997).

that when no such change is initiated, no such explanation is needed. That is the situation here. In a 1986 order dealing with Chesapeake on the very same issue, the Commission found that remediation costs were extraordinary expenses and authorized Chesapeake to amortize the remediation costs over five years, but it denied inclusion of the unamortized balance in the rate base as a "fair balance" between the interests of the ratepayers and stockholders. *In re Chesapeake Util. Corp.*, Del. Public Serv. Comm'n, Docket No. 85–17, Order No. 2728 at 6 (March 25, 1986). According to the Commission, it has followed similar procedures on at least three other occasions, amortizing the environmental costs over several years while not providing for rate base treatment of the unamortized balance. *See* Docket Nos. 87–32, 90–14, 93–20, *cited in* Appellee DPSC Answering Br. at 11. Only the latter two were available either through online services or the parties' submissions. *See In re Chesapeake Util. Corp.*, Del. Public Serv. Comm'n, Docket No. 90–14, Order No. 3159, 1991 WL 537100 (July 30, 1991); *In re Chesapeake Util. Corp.*, Del. Public Serv. Comm'n, Docket No. 93–20, Order No. 3570 (Feb. 23, 1993). At no point, at least in Docket Nos. 90–14 and 93–20, did the Company argue that the remediation costs were extraordinary expenses or that it should be given rate base treatment for the unamortized balance, and it certainly did not appeal the order. It is clear, then, that the Delaware Commission's order in this case was consistent with its prior decisions.

#### 4. Deference to the Commission's expertise

As the Court noted in its recitation of the standard of review, it must give substantial weight to the decision of the Commission as to the interpretation of a statute which it is empowered to enforce, and that decision will not be reversed unless it is clearly erroneous. *See* 26 *Del. C.* § 510. The Commission's findings are subject, of course, to a determination of whether substantial evidence exists to support the decision. All of this indicates that the Court should be fairly deferential to the Commission's conclusions. Further support for judicial deference lies in the afore-mentioned fact that there is no agreement among the public service commissions and courts of different states as to expense characterization or rate base treatment. Had there been unanimity among the courts and public service commissions of other states contrary to the Delaware Commission's ruling, the Court might have had reason to turn an especially critical eye toward the Commission. But if these various commissions and courts are fragmented, this Court will be especially careful in reviewing the judgment of a Commission entrusted with the expertise of applying this law.

#### 5. The Commission's Order is flexible

The Court also believes that the flexibility of the Commission's Order should be a consideration in its decision. The Commission expressly recognized the possibility that once many of the uncertainties regarding total remediation costs, identity of PRPs, and difficulty with obtaining financing are resolved, Chesapeake might be able to show that its effective operation is impaired by not permitting recovery of the carrying costs on the unamortized balance. If that possibility materializes, the Commission stated that it would consider authorizing the Company to earn its short term debt rate on the amount of the unamortized balance in excess of a certain level. *See* Order No. 4104, ¶ 110 at 47. This flexibility allows the Commission, should the need arise, to do in the future exactly that which Chesapeake seeks to have done now, and, perhaps most importantly, it allows the Commission and Chesapeake to achieve that purpose without having to go through the regulatory rigmarole incumbent with changing the rate base to account for the annual change in the unamortized balance.

In the Court's opinion, this is not only an eminently reasonable but an attractively desirable exercise of the Commission's discretion. Moreover, it seems to the Court that, given the discretion afforded the Commission by statute and the need for flexibility in dealing with environmental cleanup costs, it is eminently fair to balance the costs, that is, "share" them between investors and ratepayers. The expense, by its very nature, lends

itself as a risk of investment. But the expenses is a recent invention of significant impact for which help to the utility is needed. On the one hand, there is the need to encourage utilities to clean up the sites by enabling a utility to recover some or all of its cleanup costs. On the other hand, denying the carrying costs will perhaps act as an incentive for cleanliness and for utilities to pursue other PRPs and any insurance claims and lower the costs for the utility's ratepayers. This Commission is not alone among its siblings in using such sharing and retaining such flexibility. *See* n. 14, *supra.*

### VI. CONCLUSION

The Delaware Public Service Commission did not commit an error of law in finding that it is not required to allow the Chesapeake Utility Corporation to add the unamortized balance of the remediation expenses associated with the cleanup of the Dover Site to its rate base in order to recover the carrying charges on that unamortized balance. The Commission's decision that the remediation costs are extraordinary expenses is supported by substantial evidence, as is its decision that Chesapeake has failed to show that denying rate base treatment of the unamortized balance will impair the effective operation of the Company. For these and all of the foregoing reasons, the decision of the Public Service Commission is AFFIRMED. IT IS SO ORDERED.